**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| COMMON CAUSE INDIANA and INDIANA STATE CONFERENCE OF THE NAACP | ) ) ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-2007-SEB-TAB |
| | ) | |
| CONNIE LAWSON, in her official capacity as Indiana Secretary of State, and PAUL OKESON, S. ANTHONY LONG, SUZANNAH WILSON OVERHOLT, and ZACHARY E. KLUTZ, in their official capacities as members of the Indiana Election Commission, | ) ) ) ) ) ) ) ) | |
| | ) | |
| *Defendants.* | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs bring this action to prevent mass disenfranchisement of Indiana voters in the

November 3, 2020, election.  Absent injunctive relief, thousands of voters are likely to have their

mail-in ballots rejected solely because they are received after noon on Election Day—through no

fault of their own.  Because of disruptions and delays in the delivery of mail by the United States

Postal Service, even voters who timely request and return their ballots may find they are not

delivered to election officials until after the deadline.  Others may never receive their ballot or

receive it too late to return by the deadline.  All of this was on full display in the June 2, 2020,

election and is highly likely to reoccur in the November 3, 2020, election.  Indiana's noon

Election Day deadline for receipt of mail-in ballots is an artifact of a ballot-counting procedure

that is no longer in use, and is inconsistent with Indiana's other ballot receipt and counting

1

deadlines.  This early receipt deadline is unjustified in any election, but it is particularly

burdensome and unjustified in this election year, when mail delivery is unreliable and the risk of

infection from COVID-19 makes voting by mail the only safe option for many voters.

### INTRODUCTION

Hundreds of thousands of Indiana voters will cast their ballots by mail in the November

3, 2020, election.  Under Indiana law, these ballots must be received by the local county election

boards by noon on Election Day in order for them to be counted (the "Noon Election Day

Receipt Deadline").  Ballots that are received by county officials after noon on Election Day will

not be counted, regardless of when they were cast and placed in the mail by the voter.

Indiana voters therefore rely on the timely delivery of mail-in ballots[1] by the United

States Postal Service ("USPS") in order to avoid being disenfranchised by the Noon Election

Day Receipt Deadline.  Because USPS cannot guarantee a specific delivery date or time, and the

time it takes each ballot to travel through the mail system can vary significantly based on a

number of factors outside the control of both voters and election administrators, Indiana's Noon

Election Day Receipt Deadline places a significant burden on the fundamental right to vote of

Indiana voters.  The risk of disenfranchisement resulting from early ballot receipt deadlines is

particularly pronounced for young voters and voters of color.[2]

---

[1] Indiana has four types of absentee voting: 1) absentee voting by mail; 2) absentee voting in-person (before Election Day); 3) absentee voting by traveling board; and 4) absentee voting by military and overseas voters. *See* Ind. Code §§ 3-11-4-1(a); 3-11-10-24; 3-11-10-25; 3-11-4-6. The terms "mail-in ballot" and "mail voting" are used in this memorandum to refer to absentee voting by mail.

[2] *See* Elise Viebeck & Michelle Ye Hee Lee, *Tens of Thousands of Mail Ballots Have Been Tossed Out in This Year's Primaries. What Will Happen in November?*, Washington Post (July 16, 2020), https://www.washingtonpost.com/politics/tens-of-thousands-of-mail-ballots-have-been-tossed-out-in-this-years-primaries-what-will-happen-in-november/2020/07/16/fa5d7e96-c527-11ea-b037-f9711f89ee46_story.html.  *See also* Pam Fessler & Elena Moore, *Signed, Sealed, Undelivered: Thousands of Mail-In Ballots Rejected for Tardiness*, NPR (July 13, 2020), https://www.npr.org/2020/07/13/889751095/signed-sealed-undelivered-thousands-of-mail-in-ballots-rejected-for-tardiness.  Marion and Lake Counties, both home to approximately 46% people of color, each saw particularly noticeable surges in mail voting in the June 2, 2020, election, with Marion County receiving twenty times the number of requests for mail-in ballots that were requested in the 2016 presidential primary election.

The ongoing COVID-19 pandemic has severely impacted the operating capacity of USPS, with tens of thousands of postal workers missing time due to infection or quarantine after exposure to the virus.[3]  Combined with an unprecedented surge in the number of voters casting their ballots by mail, this has resulted in significant delays in the delivery of mail-in ballots, both to voters initially and from voters back to election officials.[4]  There is widespread evidence of significant delays in the delivery of mail-in ballots in 2020 elections, including in Indiana during the June 2, 2020 primary election.[5]

Further exacerbating the risk of disenfranchisement, beginning in July, USPS has implemented sweeping changes to its operating procedures—including the elimination of overtime for hundreds of thousands of postal workers and instructions to leave mail behind at facilities to be processed the next day—that have and will further decrease operating capacity and increase the time it takes each voter's ballot to move through the mail system, in both directions.[6]  On August 7, instead of moving to alleviate the additional strain on staffing and operational capacity caused by the pandemic and the unprecedented increase in mail voting in

---

Associated Press, *Indianapolis Official: Many Mail-In Ballots May Go Uncounted*, WFYI Indianapolis (May 29, 2020), https://www.wfyi.org/news/articles/indianapolis-official-many-mail-in-ballots-may-go-uncounted; Alexandra Kukulka & Amy Lavalley, *Lake County Election Workers Begin Counting More Than 27,000 Mail-in Ballots Tuesday; Smooth Start in Porter County*, Chicago Tribune (June 2, 2020), https://www.chicagotribune.com/suburbs/post-tribune/ct-ptb-election-night-coverage-st-0603-20200602-hn2gpccl7bdy3dnhun4llhe5vq-story.html; United States Census Bureau, QuickFacts, Marion County, Indiana (accessed July 27, 2020), https://www.census.gov/quickfacts/marioncountyindiana; United States Census Bureau, QuickFacts, Lake County, Indiana (accessed July 27, 2020), https://www.census.gov/quickfacts/lakecountyindiana.

[3] Nicole Goodkind, *Trump-Backed Postmaster General Plans to Slow Mail Delivery*, Fortune (July 24, 2020), https://fortune.com/2020/07/24/usps-mail-delivery-postmaster-general-louis-dejoy-us-postal-service/.

[4] *See, e.g.*, Tom Scheck, Geoff Hing, Dee J. Hall, *Postal Delays, Errors In Swing States Loom Over Election*, NPR (Aug. 16, 2020), https://www.npr.org/2020/08/16/902604303/postal-delays-errors-in-swing-states-loom-over-election.

[5] *See infra* Sections I.C., II.A.

[6] Jacob Bogage, *Postal Service Memos Detail 'Difficult' Changes, Including Slower Mail Delivery*, Washington Post (July 14, 2020), https://www.washingtonpost.com/business/2020/07/14/postal-service-trump-dejoy-delay-mail/; Letter to Postmaster General from House Speaker Pelosi and Senate Minority Leader Schumer, August 6, 2020, https://www.speaker.gov/sites/speaker.house.gov/files/20200806_Letter_PostmasterDeJoy.pdf.

2020, USPS officials announced a hiring freeze and request for voluntary early retirement.[7]  And since then, USPS has begun removing physical infrastructure, including hundreds of high-volume mail sorting machines and neighborhood mailboxes across the country, including in Indiana.[8]  As members of Congress and the President alike have acknowledged, these conditions have already combined to seriously undermine the ability of USPS to deliver mail in a timely manner, and without a change in course are likely to continue to do so in advance of November 3, 2020.[9]  Indeed, USPS has recently sent letters to 46 states, including Indiana,[10] warning that voters are at risk of disenfranchisement due to delays in the delivery of their ballots.[11]

At the same time, the risk of contracting COVID-19 from voting in person means both that an unprecedented number of Indiana voters will attempt to vote by mail in the November 3, 2020, election and that many voters who are unable to successfully comply with the Noon Election Day Receipt Deadline due to mail delays will also be unable to safely vote in person. Taken together, these factors make the burden imposed on voters by the Noon Election Day

---

[7] Press Release, *Postmaster General Louis DeJoy Modifies Organizational Structure to Support USPS Mission*, USPS Postal News (Aug. 7, 2020), https://about.usps.com/newsroom/national-releases/2020/0807-pmg-modifies-organizational-structure.pdf; Jacob Bogage, *Postal Service Overhauls Leadership as Democrats Press for Investigation of Mail Delays*, Washington Post (Aug. 7, 2020), https://www.washingtonpost.com/business/2020/08/07/postal-service-investigation-dejoy/.

[8] Jacob Bogage and Joseph Marks, *House Accelerates Oversight of Postal Service as Uproar Grows, Demanding Top Officials Testify at 'Urgent' Hearing*, Washington Post (Aug. 16, 2020), https://www.washingtonpost.com/business/2020/08/16/postal-service-mail-democrats-hearing-dejoy/; "Equipment Reduction Plan," USPS, May 15, 2020, https://assets.documentcloud.org/documents/7035434/USPS-Equipment-Reduction-Plan.pdf.

[9] *See* Letter to Postmaster General from 175 Members of Congress, August 12, 2020, https://www.speaker.gov/sites/speaker.house.gov/files/documents/20200812_Letter_PostmasterGeneral.pdf; President Trump Coronavirus News Conference at 7:45-12:45, C-SPAN (Aug. 12, 2020), https://www.c-span.org/video/?474761-1/president-trump-comments-joe-biden-choosing-kamala-harris-running-mate.

[10] *See* Letter to Secretary of State Connie Lawson from USPS General Counsel Thomas J. Marshall, July 29, 2020. [Dkt. 9-1.]

[11] Erin Cox, Elise Viebeck, Jacob Bogage, and Christopher Ingraham, *Postal Service Warns 46 States Their Voters Could be Disenfranchised by Delayed Mail-in Ballots*, Washington Post (Aug. 14, 2020), https://www.washingtonpost.com/local/md-politics/usps-states-delayed-mail-in-ballots/2020/08/14/64bf3c3c-dcc7-11ea-8051-d5f887d73381_story.html.

Receipt Deadline even more substantial in the November 3, 2020, election and any future elections held during the pandemic.

This burden is unjustified by any interest Indiana may have in receiving mail-in ballots by noon on Election Day.  While Indiana law previously required that mail-in ballots be counted at individual polling places on Election Day, beginning in 2019 all mail-in ballots must now be counted at central locations in each county.  This change removes any previous interest in noon receipt related to the need to transport ballots to each polling place on Election Day.  Moreover, Indiana law already provides for the counting of mail-in ballots cast by overseas voters that are postmarked on or before Election Day but not received by that day;[12] a ten-day period following Election Day for the counting of both mail-in ballots cast by overseas voters and provisional ballots cast in person;[13] and three additional days after that ten-day period for the ballot counts to be finalized and certified to the state.[14]  Because Indiana law already provides for the counting of ballots up to ten days following Election Day, any asserted interest in receiving mail-in ballots by *any* time on Election Day is minimal and certainly not substantial enough to justify disenfranchisement of voters whose ballots were cast and placed in the mail on or before Election Day and received by the county during the existing ten-day counting period.

Because the Noon Election Day Receipt Deadline imposes a significant burden on voters and does not advance any state interest sufficiently weighty to justify this burden, it violates the fundamental right to vote of Indiana voters protected by the United States Constitution and must be enjoined.

---

[12] Ind. Code § 3-12-1-17.

[13] Ind. Code §§ 3-11.7-5-1, 3-12-1-17.

[14] Ind. Code § 3-12-5-6.

Further, because Plaintiffs Common Cause Indiana and the Indiana State Conference of the NAACP and their members will suffer irreparable harm without an injunction issued in advance of the November 3, 2020, election—a harm that far outweighs any to Defendants—and can demonstrate both that they are likely to succeed on the merits and lack an adequate remedy at law, the Noon Election Day Receipt Deadline must be preliminarily enjoined.  The public interest clearly favors a preliminary injunction, both to safeguard the fundamental right to vote of all Indiana voters and to maintain public confidence in the integrity of Indiana elections by preventing the disenfranchisement of thousands of eligible Indiana voters due to factors outside of their control.

## I.  FACTUAL BACKGROUND

### A.  Voting by Mail in Indiana

Indiana normally restricts eligibility to vote by mail to voters who qualify under a list of specific excuses, including absence from their county or employment throughout Election Day, age, and disability.  *See* Ind. Code § 3-11-10-24.  Recognizing the risks inherent to in-person voting created by the COVID-19 pandemic, Defendant members of the Indiana Election Commission ("IEC") expanded eligibility to vote by mail in the rescheduled June 2, 2020 primary to include any "voter who is unable to complete their ballot because they are temporarily unable to physically touch or be in safe proximity to another person,"[15] effectively allowing all Indiana voters to qualify.  Because the pandemic has not only continued, but has worsened in Indiana since the IEC made this determination—and is certain to persist through the November

---

[15] Ind. Election Comm'n, Order No. 2020-37, Concerning Emergency Provisions Affecting the 2020 Indiana Primary Election, Section 9A (Mar. 25, 2020), *available at* https://www.in.gov/sos/elections/files/Indiana%20Election%20Commission%20Order%202020-37%20(002)%20g.pdf.

3, 2020, election[16]—it would be unreasonable for the IEC to fail to again expand eligibility to vote by mail in advance of November 3.  There is also an ongoing federal lawsuit in the Southern District of Indiana that, if successful, would expand eligibility for mail voting.[17]  Even without expanded eligibility, it is likely that an unprecedented number of Indiana voters will cast mail-in ballots in the November 3, 2020, election in order to avoid the risk of infection from voting in person.

Indiana voters can apply to vote by mail online, by mailing or hand delivering a physical application to their county election board, or by emailing an image of their completed application to county officials or the state.[18]  Voters may apply as early as the conclusion of the previous election, and Indiana is currently accepting applications to vote by mail in the November 3, 2020, election.[19]  Under Indiana law, an application to vote via absentee ballot by mail must be received by the relevant county election board or other appropriate official by 11:59 PM on the twelfth day before election day, which is October 22 for the November 3, 2020, election.  Ind. Code § 3-11-4-3.  For Presidential elections, federal law requires states to allow voters "who may be absent from their election district or unit in such State on the day such election is held" to apply "not later than seven days immediately prior to such election," 52 U.S.C. § 10502(d), or October 27 for the November 3, 2020, election.

---

[16] *See infra* Section I.B

[17] *See Barbara Tully, et al. v. Paul Okeson, et al.*, 1:20-cv-01271 (S.D. Ind. April 29, 2020). As of July 31, the case is fully briefed before Judge Hanlon and awaiting rulings on Plaintiffs' Motions for Preliminary Injunction and Class Certification.

[18] Indiana Secretary of State, "Absentee Voting," https://www.in.gov/sos/elections/2402.htm.

[19] *Id.*

County officials must begin mailing ballots 45 days prior to Election Day to voters whose applications have been approved as of that date.[20]  For voters applying after this date, Indiana law requires that county officials mail the ballot "on the day of the receipt of the voter's application."  Ind. Code § 3-11-4-18(c)(1).  The ballot must be mailed to the voter along with a "first class postage pre-paid return security envelope."[21]  "Each ballot may be assigned a unique tracking number as prescribed by the election division using IMb Tracing or a similar automated tracking method to provide real-time tracking information for the envelope containing the ballot. As used in this subsection, 'IMb Tracing' refers to a real-time mail tracking service offered through the United States Postal Service."[22]  Ind. Code § 3-11-4-18(a).  Counties are not required to make their ballot envelopes trackable, however, and, upon information and belief, no Indiana counties do so.  If a voter has not received their ballot "after a reasonable time has elapsed for delivery of the ballot by mail," the ballot is "destroyed, spoiled, lost," or the voter makes an error on their ballot, they may request that a replacement ballot be sent to them by filing a statement with their county election board.  Ind. Code § 3-11-4-17.7.

Once the voter has received their ballot, they fill it out, insert it into the prepaid return envelope, sign and seal the envelope, and place it back in the mail.  Once USPS takes custody of the ballot, it is transported to a mail facility for processing, at which point the ballot envelope is marked with an official postmark or other marking indicating the date on which USPS took

---

[20] Ind. Code § 3-11-4-15 (providing that ballots be delivered to each county at least 50 days prior to Election Day); Ind. Code § 3-11-4-18(c)(2) (requiring ballots to be sent within 5 days of delivery of the ballots to the county).

[21] Indiana Secretary of State, "Absentee Voting," https://www.in.gov/sos/elections/2402.htm; Ind. Code § 3-11-4-18(a).

[22] *See* "Steps to Creating Your Intelligent Mail Barcode," USPS 2020 Election Mail Kit 600 at pp. 7-8, https://about.usps.com/kits/kit600.pdf.

custody of the ballot.[23]  Many states use the postmark or other USPS marking to determine the date on which a ballot is in the possession of USPS for the purpose of adjudicating the validity of a ballot under state law governing mail voting deadlines.[24]

In Indiana, in order for a mail-in ballot to be counted, it must be received by the county election board "before noon on election day," regardless of the date on which it was cast and mailed by the voter.  Ind. Code §§ 3-11.5-4-3; 3-11.5-4-10.  Indiana law thus removes control over whether a voter's mail-in ballot complies with state law from the voter and places it in the hands of USPS.  Nor do voters have any way of knowing whether their ballot will be received by the Noon Election Day Receipt Deadline, unless their county decides to use the Intelligent Mail Barcode tracking technology provided by USPS or another tracking technology, as contemplated—but not required—by Indiana law.  *See* Ind. Code § 3-11-4-18(a).  Currently, Plaintiffs are not aware of any Indiana counties that use the Intelligent Mail Barcode technology or another tracking technology to allow voters to track their ballot as it moves through the mail system.

### B.  The COVID-19 Pandemic

---

[23] *See* USPS Handbook PO-408, Section 1-1.3, *available at* https://about.usps.com/handbooks/po408/ch1_003.htm. All First Class mail receives an official postmark, and even mail that doesn't receive an official postmark is marked with some form of individualized marking which contains information including the date of processing.  In the absence of an official postmark, this individualized marking can be used to determine the date on which a mail-in ballot is in the custody of USPS for the purpose of adjudicating a mail-in ballot postmark deadline. *See, e.g.*, WA Elections Weekly, "Fluorescent Barcode Scanners" (Oct. 17, 2018), https://mailchi.mp/sos/wa-elections-weekly-same-day-workshop-votewa-update-kudos-to-king-county-new-osos-employee-1061377?e=79321f8fa8; Ohio Secretary of State, Directive 2016-03, "Letter to County Boards of Election" (Jan. 29, 2016), https://www.ohiosos.gov/globalassets/elections/directives/2016/dir2016-03.pdf.

[24] *See, e.g.*, Ohio, R.C. § 3509.05 (counts ballots received within ten days if postmarked on or before one day prior to Election Day); Kansas, K.S.A. 25-1132 (counts ballots received within three days if postmarked on or before Election Day); Illinois, 10 ILCS 5/19-8, 10 ILCS 5/18A-15 (counts ballots received within fourteen days if postmarked on or before Election Day). *See also Republican Nat'l Comm. v. Democratic Nat'l Comm.,* 140 S. Ct. 1205, 1208 (April 6, 2020) (holding that Wisconsin election officials must count ballots received within six days if postmarked on or before Election Day in its April 7, 2020, election).

COVID-19 is an infectious disease caused by a novel coronavirus that has spread throughout the world at a rapid pace.  The virus that causes COVID-19 is highly contagious and spreads through a variety of means, including respiratory droplets and contact between individuals.[25]  Once contracted, it can have a range of effects on the individual, from passing without any symptoms at all, to flu-like symptoms, to causing a severe immune system response that can cause fluid to build in the person's lungs and lead to death.[26]  The disease poses a potentially severe health risk to all individuals, although public health experts have warned that it can be particularly dangerous for certain demographics, including older people, people with underlying medical conditions, and people of color.[27]  The threat of COVID-19 is not limited to these higher-risk demographics, however, and a majority of those infected do not have any of the underlying health conditions that result in increased susceptibility to the virus.[28]

COVID-19 spreads aggressively, in part because even asymptomatic and pre-symptomatic individuals can infect others with whom they come into contact, without them even being aware that they themselves are infected.[29]  Evidence from recent studies indicates that

---

[25] Ctrs. for Disease Control & Prevention, *What You Should Know about COVID-19 to Protect Yourself and Others* (Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

[26] *See, e.g.*, Stokes EK, Zambrano LD, Anderson KN, et al., *Coronavirus Disease 2019 Case Surveillance — United States, January 22–May 30, 2020*, Morb. Mortal. Wkly. Rep. 69, 759–765 (June 19, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6924e2-H.pdf.

[27] Ctrs. for Disease Control & Prevention, *Racial and Ethnic Minority Groups* (Apr. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html; Richard A. Oppel, Jr., et al., *The Fullest Look Yet at the Racial Inequity of Coronavirus*, New York Times (July 5, 2020), https://www.nytimes.com/interactive/2020/07/05/us/coronavirus-latinos-african-americans-cdc-data.html; Ctrs. for Disease Control & Prevention, *Health Equity Considerations and Racial and Ethnic Minority Groups* (July 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html.

[28] Ctrs. for Disease Control & Prevention, *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020* (Apr. 3, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm.

[29] *See* Furukawa, Brooks & Sobel, *Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic*, EMERG. INFECT. DIS. Vol. 26, No. 7 (May 4, 2020), *available at* https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article. *See also S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (May 29, 2020) (Roberts, C.J, concurring in the denial of application for injunctive relief)

between 30% and 40% of infected individuals never develop symptoms, yet carry as much of the virus and are potentially as contagious as those who do show symptoms and remain contagious for around seventeen days after infection.[30]

Because of the highly contagious and potentially deadly nature of the disease, on March 13, 2020, President Donald J. Trump declared a national state of emergency as a result of the widespread outbreak of COVID-19.  Within a week, 48 states—including Indiana on March 6— had declared local states of emergency.[31]  Since then, the virus has continued to spread throughout the United States, resulting in a higher number of infections and deaths than any other country. At the time of this filing, the confirmed number of infections in the United States has surpassed 5.3 million, and over 168,000 people have died from the virus nationwide.[32]  In Indiana, over 80,000 people have tested positive for the virus and 2,924 people have died from it.[33]  And the actual number of coronavirus cases are likely to be significantly higher than the confirmed numbers indicate.[34]

---

("At this time, there is no known cure, no effective treatment, and no vaccine. Because people may be infected but asympotomatic, they may unwittingly infect others.").

[30] *See* Apoorva Mandavilli, *Even Asymptomatic People Carry the Coronavirus in High Amounts*, New York Times (Aug. 6, 2020), *available at* https://www.nytimes.com/2020/08/06/health/coronavirus-asymptomatic-transmission.html.

[31] Rosie Perper et al., *Almost All US States Have Declared States of Emergency to Fight Corona Virus—Here's What It Means for Them*, Bus. Insider (Mar. 17, 2020), *available at* https://www.businessinsider.com/california-washington-state-of-emergency-coronavirus-what-it-means-2020-3#indiana-9.

[32] *Coronavirus Disease 2019 (COVID-19) Cases and Deaths in the U.S.,* Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html (last updated August 16, 2020).

[33] *Indiana COVID-19 Data Report*, Indiana COVID-19 Data Report, https://www.coronavirus.in.gov/2393.htm (last updated August 15, 2020).

[34] Alice Park, *CDC Head Estimates U.S> Coronavirus Cases Might be 10 Times Higher Than Data Show*, TIME (June 25, 2020), https://time.com/5859790/cdc-coronavirus-estimates/.

"Social distancing" and other measures imposed by federal, state, and local governments have been crucial to slowing the spread and preventing even wider infection and death.[35]  It is unknown, however, whether those who have already been infected will develop an immune response sufficient to prevent reinfection, nor whether a vaccine—once widely available, which is highly unlikely until 2021—will confer long-term immunity.[36]  Because of our collective failure to contain the spread of the virus, public health experts predict that the death toll in the United States will double between now and the end of 2020, in part due to an increased rate of transmission during the fall and the fact that the virus has now made inroads in all corners of nearly every state.[37]  In Indiana, the rate of infection has increased significantly through July and early August, and since July 23 an average of over 800 new individuals have been testing positive each day.[38]

The pandemic has had a significant impact on the 2020 election cycle.  Many states, including Indiana,[39] have postponed elections or have changed or suspended state laws governing various aspects of elections.  Because of the highly contagious nature of the virus and the large number of people who move through a polling place throughout a typical Election

---

[35] Neil M. Ferguson et al., *Report 9: Impact of Non-Pharmaceutical Interventions (NPIs) to Reduce COVID-19 Mortality and Healthcare Demand*, Imperial College COVID-19 Response Team (Mar. 16, 2020), https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-fellowships/Imperial-College-COVID19-NPI-modelling-16-03-2020.pdf (estimating that without any preventative measures the United States could have seen as many as 2.2 million deaths).

[36] *See* Stacey Vanek Smith, *FDA Adviser: Not Realistic To Expect A COVID-19 Vaccine in 2020* NPR (Aug. 5, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/08/05/899411652/fda-adviser-not-realistic-to-expect-a-covid-19-vaccine-in-2020; Will Feuer, *Dr. Fauci Says Coronavirus Immunity May Be 'Finite,' Duration Remains Uncertain*, CNBC (July 6, 2020), https://www.cnbc.com/2020/07/06/dr-fauci-says-coronavirus-immunity-may-be-finite-duration-remains-uncertain.html.

[37] Nurith Aizenman, *300,000 Deaths By December? 9 Takeaways From The Newest COVID-19 Projections*, NPR (August 6, 2020), https://www.npr.org/sections/health-shots/2020/08/06/900000671/300-000-deaths-by-december-9-takeaways-of-the-newest-covid-19-projections.

[38] *Indiana COVID-19 Data Report*, Indiana COVID-19 Data Report, https://www.coronavirus.in.gov/2393.htm (last updated August 15, 2020).

[39] *See infra* Section 1.C.

Day—many of them unknowingly infected yet asymptomatic or pre-symptomatic—the risk of being exposed to the virus while voting in person is significant.[40]  As a result, many more voters are choosing to vote by mail to avoid the risk of infection from voting in person.  This surge in mail voting has created an enormous strain on election officials, particularly in states that—like Indiana—normally restrict eligibility to vote by mail.[41]

The pandemic has also significantly impacted the Postal Service.  Thousands of postal workers have contracted COVID-19, dozens have died, and tens of thousands have had to quarantine for two weeks after being exposed to the virus.[42]  The combination of this strain on USPS operational capacity and a surge in mail voting during the pandemic has led to a number of disruptions to mail delivery, including significant delays and lost or undelivered mail-in

---

[40] Evidence of the health risks associated with in-person voting is unfortunately abundant, despite efforts by states to mitigate the risks.  For example, multiple Florida poll workers tested positive for COVID-19 in the aftermath of the in-person primary election on March 17, long before the virus was widespread in Florida and nationwide, leaving election officials to contact voters who had voted at those locations and warn them they were at risk.  Kent Justice & Steve Patrick, *Duval County Poll Worker Tests Positive for Coronavirus*, News 4 Jax (Mar. 30, 2020), https://www.news4jax.com/news/local/2020/03/30/duval-county-poll-worker-tests-positive-for-coronavirus/. Wisconsin officials reported 71 voters contracted COVID-19 after voting in person in their April 7 election. John Hart, *71 People Who Went to The Polls on April 7 Got COVID-19; Tie to Election Uncertain*, Wisconsin State Journal (May 16, 2020), https://madison.com/wsj/news/local/health-med-fit/71-people-who-went-to-the-polls-on-april-7-got-covid-19-tie-to/article_ef5ab183-8e29-579a-a52b-1de069c320c7.html.  Poll workers have tested positive after elections in other states including Alabama, Texas, and Pennsylvania.  *See* Eddie Burkhalter, *Piedmont Poll Worker in Tuesday's Runoff Tests Positive for COVID-19, Hospitalized*, Alabama Political Reporter (July 20, 2020), https://www.alreporter.com/2020/07/20/piedmont-poll-worker-in-tuesdays-runoff-tests-positive-for-covid-19-hospitalized/; Tommy Witherspoon, *Election Workers Come Down With COVID-19 as Numbers Continue to Rise*, Waco Tribune-Herald (July 20, 2020), https://wacotrib.com/news/local/govt-and-politics/election-workers-come-down-with-covid-19-as-numbers-continue-to-rise/article_2940a912-c181-560d-bbf9-3272cea52675.html; Katie Meyer & Emily Previti, *A Philly Poll Watcher Got COVID-19, But The City Isn't Notifying Voters*, WHYY (June 24, 2020), https://whyy.org/articles/a-philly-poll-watcher-got-covid-19-but-the-city-isnt-notifying-voters/.

[41] Elise Viebeck & Annie Gowen, *Anxieties About Mail Ballots on Display in Latest Round of Primaries, Highlighting Worries for Fall*, Washington Post (Aug. 4, 2020), https://www.washingtonpost.com/politics/michigan-ballots-tangled-in-mail-delays-in-advance-of-tuesday-primary/2020/08/03/95c2039e-d5a8-11ea-9c3b-dfc394c03988_story.html; *see also infra* Section I.C.

[42] Nicole Goodkind, *Trump-Backed Postmaster General Plans to Slow Mail Delivery*, Fortune (July 24, 2020), https://fortune.com/2020/07/24/usps-mail-delivery-postmaster-general-louis-dejoy-us-postal-service/.

ballots in states across the country[43]—including Indiana.[44]  Recent operational changes at USPS will only exacerbate this crisis.[45]

### C.  Indiana's June 2, 2020, Election

In separate orders issued March 25 and April 17, 2020, Defendant members of the IEC postponed Indiana's primary election from May 5 to June 2, 2020.[46]  These orders also suspended and modified numerous statutory deadlines to accommodate this postponement—including extending the time within which county election officials must complete the counting of mail-in ballots from Election Day to ten days after Election Day[47]—though not the Noon Election Day Receipt Deadline itself.

The IEC significantly expanded eligibility to vote by mail, ruling that the words "voter with disabilities" in Ind. Code § 3-11-10-24(a)(4) be construed for purposes of the rescheduled primary election to include any "voter who is unable to complete their ballot because they are temporarily unable to physically touch or be in safe proximity to another person."[48]  Due to the

---

[43] *See, e.g.,* Michelle Ye Hee Lee and Jared Goyotte, *Their Mail Was Not Delivered for Days. Now These Minneapolis Residents Are Worried About Their Votes Counting.* Washington Post (Aug. 8, 2020), https://www.washingtonpost.com/politics/minneapolis-mail-ballot-delays/2020/08/08/6ecf9978-d8ea-11ea-930e-d88518c57dcc_story.html; Ryan McCarthy and Maryam Jameel, *The Postal Service is Steadily Getting Worse—Can it Handle a National Mail-In Election?*, ProPublica (June 15, 2020), https://www.propublica.org/article/the-postal-service-is-steadily-getting-worse-can-it-handle-a-national-mail-in-election (noting "there already have been significant delays and mistakes in delivering ballots in Indiana" among other states).

[44] *See infra* Section I.C.

[45] *See infra* Section I.D.

[46] Ind. Election Comm'n, Order No. 2020-37, Concerning Emergency Provisions Affecting the 2020 Indiana Primary Election (Mar. 25, 2020), *available at* https://www.in.gov/sos/elections/files/Indiana%20Election%20Commission%20Order%202020-37%20(002)%20g.pdf; Ind. Election Comm'n, Order No. 2020-40, Concerning Emergency Provisions Affecting the 2020 Indiana Primary Election (April 17, 2020), *available at* https://www.in.gov/sos/elections/files/Order%202020-40%20signed.pdf.

[47] S*ee* IEC Order No. 2020-37, Section 15D.

[48] Ind. Election Comm'n, Order No. 2020-37, Concerning Emergency Provisions Affecting the 2020 Indiana Primary Election, Section 9A (Mar. 25, 2020), *available at* https://www.in.gov/sos/elections/files/Indiana%20Election%20Commission%20Order%202020-37%20(002)%20g.pdf.

risk of contracting COVID-19 through exposure at a polling place, this effectively extended eligibility to vote by mail to all Indiana voters.[49]

The IEC orders simultaneously reduced in-person voting options, granting county election boards discretion to "reduce and consolidate the number of polling locations and poll workers needed to conduct an election on election day"[50] and to provide fewer vote centers than required under existing law for the June 2 election.[51]   The orders also prohibited early in-person voting except between Tuesday, May 26 and noon on Monday, June 1,[52] reducing the total number of early voting days in all early voting locations from 27 days to just 6 days.[53]

The combination of universal eligibility to vote by mail, reduced in-person voting options, and fear of the coronavirus resulted in an unprecedented number of Indiana voters casting mail-in ballots in the June 2, 2020, election.  Statewide, nearly 550,000 voters requested mail-in ballots, more than ten times the number requested in the 2016 presidential primary,[54] despite the lack of a competitive presidential primary in Indiana for either party in 2020.  This surge overwhelmed both election officials and USPS, resulting in significant delays in the transmission of ballots to voters and from voters back to election officials.[55]

---

[49] *See* Dan Carden, *All Indiana Voters Can Choose to Cast Ballot by Mail for June 2 Primary Election*, NWI Times (March 25, 2020), https://www.nwitimes.com/news/local/govt-and-politics/elections/all-indiana-voters-can-choose-to-cast-ballot-by-mail-for-june-2-primary-election/article_25b2a732-f994-51a0-bb9c-7207bda0d56f.html.

[50] IEC Order No. 2020-37 Sec. 12.

[51] IEC Order No. 2020-37 Sec. 13 (permitting counties to provide one vote center for every 25,000 active voters instead of 10,000 active voters as provided by Ind. Code § 3-11-18.1-6).

[52] IEC Order No. 2020-40 Sec. 6.

[53] *Compare id. with, e.g.*, Ind. Code § 3-11-10-26 (requiring counties to provide early in-person absentee voting beginning 28 days and ending 1 day prior to election day; requiring counties to provide at least 7 hours of in-person absentee voting on each of the 2 Saturdays prior to election day).

[54] Associated Press, *Indiana Won't Change Mail-In Ballot Deadline Despite Worries*, WLFI (May 31, 2020), https://www.wlfi.com/content/news/Indiana-wont-change-mail-in-ballot-deadline-despite-worries-570904381.html.

[55] *See, e.g.*, Amelia Pak-Harvey, *Nearly 1,800 absentee ballots left uncounted in Marion County primary election*, The Indianapolis Star (June 15, 2020), https://www.indystar.com/story/news/local/marion-county/2020/06/15/indiana-primary-marion-county-absentee-ballots-left-uncounted/5334101002/; Ryan McCarthy and Maryam Jameel, *The Postal Service is Steadily Getting Worse—Can it Handle a National Mail-In Election?*,

Despite repeated warnings of the widespread disenfranchisement that would result from their failure to act,[56] Defendants failed and refused to use their emergency powers to modify the Noon Election Day Receipt Deadline for the June 2, 2020 primary election,[57] and, thus far, for the November 3, 2020 general election.  In a May 29, 2020 letter to Myla Eldridge, Marion County Clerk, Defendant Lawson offered as justification for this refusal only the vague assertion that this and other election deadlines serve unspecified "security and accountability purposes."[58]

Because of delays in the delivery of mail-in ballots, thousands of otherwise valid ballots were rejected in the June 2, 2020, primary election solely because they arrived at county election offices after the Noon Election Day Receipt Deadline, even though voters had timely requested and promptly returned their ballots after receiving them.  In Marion County alone, a total of 1,514 otherwise valid ballots were rejected despite having been postmarked on or before June 2.[59] In Hamilton County, 435 such ballots were rejected.[60]  It is likely that other counties saw similar numbers, pushing the total number of disenfranchised voters into the thousands.

Among these voters were Marilyn Tawney, Crystal Hammon, and Diana Smith. Marilyn Tawney, who has used the absentee mail-in ballot process ever since turning 65 years old, again requested a mail-in ballot for the June 2020 primary as she wanted to reduce congestion at the

---

ProPublica (June 15, 2020), https://www.propublica.org/article/the-postal-service-is-steadily-getting-worse-can-it-handle-a-national-mail-in-election (noting "there already have been significant delays and mistakes in delivering ballots in Indiana" among other states.).

[56] *See, e.g.,* Letter from Myla A. Eldridge, Marion County Clerk, to Connie Lawson, Ind. Sec. of State (May 28, 2020) (on file with author) (discussing the likelihood of widespread voter disenfranchisement because of the Noon Election Day Receipt Deadline).

[57] Brandon Smith, *Hoosiers Must Return Absentee Ballots by Noon on Election Day*, IPB News (May 28 2020), https://indianapublicradio.org/news/2020/05/hoosiers-must-return-absentee-ballots-by-noon-on-election-day/.

[58] Letter from Connie Lawson, Ind. Sec. of State, to Myla A. Eldridge, Marion County Clerk, May 29, 2020, Dkt. 9-2.

[59] Declaration of Edward Prein, Dkt. 9-3, ¶ 4.

[60] *Id*. at ¶ 7.

polls and avoid exposure to the COVID-19 virus. Declaration of Marilyn Tawney, Dkt. 9-4, ¶¶ 6-11. Even though Ms. Tawney mailed in her ballot several days before the election, her ballot was received after the noon deadline and was not counted. *Id.*, ¶¶ 12-15. Crystal Hammon requested a mail-in ballot because she knew she would be out of town on Election Day. Declaration of Crystal Hammon, Dkt. 9-5, ¶¶ 6-7. Ms. Hammon did not receive her mail-in ballot until approximately one week before June 2, 2020, and even though she soon after mailed in her vote, her ballot, too, was rejected for arriving after the noon deadline. *Id.*, ¶¶ 9-12. Diana Smith is 71 years old and was concerned about being exposed to the COVID-19 virus if she voted in person. Declaration of Diana Smith, Dkt. 9-6, ¶¶ 2, 6. Ms. Smith requested a mail-in ballot, but also later learned that her ballot had been rejected for late arrival. *Id.*, ¶¶ 7-10.

Since the June 2 election, USPS has made a number of significant changes to its operating procedures, all of which promise to further increase the time it takes a ballot to travel through the mail system.

### D. USPS Operational Changes

Less than a month after taking over as Postmaster General on June 16, Louis DeJoy circulated an internal USPS memo alerting postal workers to prepare for "difficult" policy changes, citing an effort to reduce costs and improve efficiency.[61]  Changes that took effect July 13 included the elimination of overtime for postal workers; limits on other measures local postmasters use to ameliorate staffing shortages; limits on the number of stops individual mail trucks can make along a route; and instructions to leave mail behind to be delivered the following day rather than make multiple trips to ensure timely delivery as dictated by

---

[61] Jacob Bogage, *Postal Service Memos Detail 'Difficult' Changes, Including Slower Mail Delivery*, Washington Post (July 14, 2020), https://www.washingtonpost.com/business/2020/07/14/postal-service-trump-dejoy-delay-mail/.

longstanding policy.[62]  The effect on delivery time was felt almost immediately—within weeks, voters and postal workers across the country were reporting noticeable delays, and election officials began instructing voters to drop their ballots off in person rather than return them by mail and risk their late arrival.[63]

On August 7, Postmaster DeJoy announced a hiring freeze and a request for voluntary early retirement, effectively preventing the alleviation of existing staffing shortages resulting from the pandemic.[64]  In the week following that announcement, it came to light that USPS had begun removing mail sorting machines from postal distribution centers across the country, ultimately decommissioning 671 high-volume sorting machines—fully one eighth of nationwide USPS capacity, together capable of sorting 21.4 million pieces of mail per hour.[65]  Internal USPS planning documents confirm that this targeted reduction in mail processing capacity included between a 20% and 40% reduction in the number of sorting machines located at facilities in the Great Lakes region, including significant reductions in Indiana.[66]  Also revealed was the removal

---

[62] *Id*; Michelle Ye Hee Lee & Jacob Bogage, *Postal Service Backlog Sparks Worries that Ballot Delivery Could be Delayed in November*, Washington Post (July 30, 2020), https://www.washingtonpost.com/politics/postal-service-backlog-sparks-worries-that-ballot-delivery-could-be-delayed-in-november/2020/07/30/cb19f1f4-d1d0-11ea-8d32-1ebf4e9d8e0d_story.html.

[63] *Id*.

[64] Press Release, *Postmaster General Louis DeJoy Modifies Organizational Structure to Support USPS Mission*, USPS Postal News (Aug. 7, 2020), https://www.usps.com/newsroom/national-releases/2020/0807-pmg-modifies-organizational-structure.pdf; Jacob Bogage, *Postal Service Overhauls Leadership as Democrats Press for Investigation of Mail Delays*, Washington Post (Aug. 7, 2020), https://www.washingtonpost.com/business/2020/08/07/postal-service-investigation-dejoy/.

[65] Luke Broadwater, Jack Healy, Michael D. Shear and Hailey Fuchs, *Postal Crisis Ripples Across Nation as Election Looms*, New York Times (Aug. 15, 2020), https://www.nytimes.com/2020/08/15/us/post-office-vote-by-mail.html; Erin Cox, Elise Viebeck, Jacob Bogage, and Christopher Ingraham, *Postal Service Warns 46 States Their Voters Could be Disenfranchised by Delayed Mail-in Ballots*, Washington Post (Aug. 14, 2020), https://www.washingtonpost.com/local/md-politics/usps-states-delayed-mail-in-ballots/2020/08/14/64bf3c3c-dcc7-11ea-8051-d5f887d73381_story.html.

[66] "Equipment Reduction Plan" at 2-4, 7, 12, USPS, May 15, 2020, https://assets.documentcloud.org/documents/7035434/USPS-Equipment-Reduction-Plan.pdf.  The acronyms in this document correspond with various types of high-volume mail sorting machines employed by USPS.  *See* USPS "List of Acronyms/Abbreviations," https://about.usps.com/publications/pub32/pub32_acn.htm.

of neighborhood mailboxes across the country—including in Indiana[67]—which, combined with a reduction in hours at local post offices,[68] may make it more difficult for individual voters to timely cast and place their ballots in the mail.

Any of these changes on their own would be likely to increase the time it takes mail-in ballots to travel through the mail system and for voters to complete the mail voting process. Implemented concurrently, and in the context of a public health crisis that has already seriously impacted USPS operational capacity, these changes are virtually certain to result in significant disruptions and delays in mail-in ballot delivery in advance of the November 3, 2020, election. And because of Indiana's Noon Election Day Receipt Deadline, many voters experiencing these delays will be disenfranchised through no fault of their own.  Indeed, USPS recently warned Defendant Lawson of exactly this scenario.[69]

Unless enjoined by the Court, the Noon Election Day Receipt Deadline will disenfranchise thousands of Indiana voters in the November 3, 2020, election.  As Plaintiffs will demonstrate, this widespread disenfranchisement is unjustified by any sufficiently weighty state interest and therefore constitutes an undue burden on the fundamental right to vote in violation of the First and Fourteenth Amendments to the United States Constitution.

## II.  ARGUMENT

---

[67] Chris Sikich, *Postal Service Warns Hoosier Voters to Mail Ballot Early of Risk Being Disenfranchised*, Indianapolis Star (Aug. 14, 2020), https://www.indystar.com/story/news/politics/2020/08/14/postal-service-warns-hoosier-voters-mail-ballot-early/5586852002/; Jacob Bogage and Joseph Marks, *House Accelerates Oversight of Postal Service as Uproar Grows, Demanding Top Officials Testify at 'Urgent' Hearing*, Washington Post (Aug. 16, 2020), https://www.washingtonpost.com/business/2020/08/16/postal-service-mail-democrats-hearing-dejoy/.

[68] Aaron Gordon, *USPS Plans to Slash Hours at Many Post Offices, Hopeing to Save a Buck*, VICE News (July 29, 2020), https://www.vice.com/en_us/article/wxq47q/usps-plans-to-slash-hours-at-many-post-offices-hoping-to-save-a-buck.

[69] *See* Letter to Secretary of State Connie Lawson from USPS General Counsel Thomas J. Marshall, July 29, 2020, Dkt. 9-1.

A preliminary injunction is an equitable remedy available to plaintiffs who demonstrate the need for immediate relief to prevent irreparable harms that would otherwise occur prior to resolution of the case on the merits. *See Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). To obtain a preliminary injunction, plaintiffs must first demonstrate: 1) "some likelihood" of success on the merits; 2) the absence of an adequate remedy at law; and 3) that they will suffer irreparable harm absent an injunction. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 365 (7th Cir. 2019). The court must then "weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *Id.* (citation omitted). The higher a plaintiff's likelihood of success on the merits, the less decisively the balance of harms must tilt in favor of preliminary relief. *Id.* And, even if a court finds a lesser likelihood of success on the merits, a preliminary injunction is warranted where the balance of the harms tips heavily in plaintiffs' favor. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001).

A court may grant a preliminary injunction based on less formal procedures and on less extensive evidence than required at a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395(1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."). For example, courts may rely on hearsay and various other normally-inadmissible materials, documents, and statements because the Federal Rules of Evidence apply differently in a proceeding on a motion for a preliminary relief. *See Goodman v. Ill. Dept. of Financial and Professional Regulation*, 430 F.3d 432, 439 (7th Cir. 2005); *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997) (affidavit that would be inadmissible at trial could be considered in a summary proceeding such as a proceeding on a preliminary injunction motion);

20

*S.E.C. v. Cherif,* 933 F.2d 403, 412 n.8 (7th Cir. 1991) (normally inadmissible hearsay can be considered in adjudicating a motion for preliminary injunction).

Absent an injunction issued in advance of the November 3, 2020, election, Common Cause Indiana and the Indiana State Conference of the NAACP and their members will suffer the irreparable harms of disenfranchisement and diversion and drain of limited organizational resources, harms for which there is no adequate remedy at law. These harms greatly outweigh any harm to Defendants from enjoining the Noon Election Day Receipt Deadline, which would be limited to the administrative resources necessary to issue a rule requiring county election boards to accept ballots postmarked on or before Election Day and received within ten days following Election Day, a process already undertaken by each county for counting mail-in ballots cast by overseas voters and adjudicating provisional ballots. Plaintiffs are likely to succeed on the merits because the burdens imposed on voters by the Noon Election Day Receipt Deadline are very substantial yet advance no state interest sufficiently weighty to justify the widespread disenfranchisement of eligible voters through no fault of their own. Finally, the public interest strongly favors a preliminary injunction, both to safeguard the fundamental right to vote of all Indiana voters and to maintain public confidence in the integrity of Indiana elections by preventing the disenfranchisement of thousands of eligible Indiana voters due to factors outside their control.

### A. Plaintiffs are Likely to Succeed on the Merits

In order to demonstrate they are likely to succeed on the merits, Plaintiffs must demonstrate they have, at minimum, a "greater than negligible chance of winning." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). Plaintiffs Common Cause Indiana and the Indiana State Conference of the NAACP easily meet and exceed that low bar:

they are very likely to succeed on the merits because they can demonstrate that the Noon

Election Day Receipt Deadline imposes significant burdens on voters while failing to advance

any sufficiently weighty state interest.

Under the First and Fourteenth Amendments to the United States Constitution, a court

considering a challenge to a state election law must carefully weigh the character and magnitude

of the burden imposed on voters against "the precise interests put forward by the State as

justifications for the burden imposed by its rule, taking into consideration the extent to which

those interests make it necessary to burden the plaintiff's rights." *Burdick v. Takushi*, 504 U.S.

428, 434 (1992) (internal quotation marks omitted); *Anderson v. Celebrezze*, 460 U.S. 780, 789

(1983). "However slight th[e] burden may appear, . . . it must be justified by relevant and

legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty.

Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling opinion) (internal quotation

marks omitted); *accord Tripp v. Scholz*, 872 F.3d 857, 864 (7th Cir. 2017).

The Noon Election Day Receipt Deadline imposes a very substantial burden on Indiana

voters.  By requiring mail-in ballots to be received by noon on Election Day, Indiana has

removed from voters the ability to ensure their ballot is counted by timely placing it in the mail,

making them instead subject to the vicissitudes of the USPS's delivery schedule.  Placing

Indiana voters' fundamental right to vote in the hands of USPS—which by its own admission

cannot guarantee delivery of mail within a specific time frame[70]—is inherently burdensome.

*See, e.g.*, *Gallagher v. New York State Bd. of Elections*, No. 20 CIV. 5504 (AT), 2020 WL

4496849, at *16 (S.D.N.Y. Aug. 3, 2020) (finding burden "exceptionally severe" where voters'

---

[70] *See* Letter from USPS General Counsel Thomas J. Marshall, July 29, 2020, Dkt. 9-1 ("[T]he Postal Service cannot guarantee a specific delivery date or alter standards to comport with individual state election laws.").

mail-in ballots were rejected based on USPS errors "out of the voters' control"). This burden is imposed on Indiana voters in all elections. The substantiality of this burden has, however, increased dramatically during the COVID-19 pandemic because of widespread disruption and delays in mail delivery and the compelling need for many voters to cast their ballots by mail in order to avoid the risk of infection from in-person voting.[71]

The burden imposed on voters by the Noon Election Day Receipt Deadline in the November 3, 2020, election was laid painfully bare in the June 2, 2020 Indiana primary. Declarants Marilyn Tawney, Crystal Hammon, and Diana Smith all had their ballots rejected from no fault of their own. These are just a few of the thousands of voters who were disenfranchised in the June 2020 primary, including over 1,500 voters in Marion County and over 400 voters in Hamilton County.

This burden has already increased since the June 2 election due to recent changes in USPS operating procedures that have further reduced USPS operating capacity and will almost certainly increase the time it takes for ballots to move through the mail system.[72]

The burden imposed on voters by the Noon Election Day Receipt Deadline is made even more substantial by Indiana's lack of any workable safeguards for voters whose ballots are delayed, despite the ready availability and low cost of such safeguards. As Indiana law contemplates,[73] USPS already provides Intelligent Mail Barcode tracking capability, which

---

[71] *See, e.g.*, *Gallagher v. New York State Bd. of Elections*, No. 20 CIV. 5504 (AT), 2020 WL 4496849, at *16 (S.D.N.Y. Aug. 3, 2020) ("Applying [state law] to invalidate such a significant number of absentee ballots, when there is strong evidence that those ballots are otherwise valid, where many voters doubtless saw little choice but to use absentee ballots during the COVID-19 pandemic, and after the state took a variety of proactive measures to increase the use of absentee ballots, would strike a serious blow to voters' First Amendment right to associate themselves with candidates who express their values, if not undermine confidence in the democratic process itself.").

[72] *See supra* Section I.D.

[73] *See* Ind. Code § 3-11-4-18(a).

would enable voters to track their ballot in real time as it moves through the mail system.[74]  If a voter could see that their ballot is delayed, they could take actions—such as requesting a replacement ballot[75] or voting in person on or before Election Day if able—thereby preventing their own disenfranchisement.  But Indiana does not require election officials to take advantage of this simple, already existing means to safeguard voters' fundamental right to vote.  Instead, Indiana voters currently lack this opportunity despite Indiana codifying in statute its awareness of the common sense and readily available safeguard of ensuring all voters can track their mail-in ballots—a failure that is all the more burdensome given the mail delays experienced in the June 2, 2020, election and expected in the November 3, 2020, election.

Defendants cannot assert any state interest sufficiently weighty to justify the burden on voters imposed by the Noon Election Day Receipt Deadline. First, the state has no interest in requiring receipt of mail-in ballots specifically by *noon* on Election Day. Accepting ballots received by noon while rejecting those received later in the day is arbitrary and unjustified by even the barest of administrative interests. Indiana law previously required mail-in ballots to be adjudicated and counted at each individual precinct on Election Day, arguably supporting an interest in early receipt to facilitate transport of ballots to numerous locations throughout each county. Beginning in 1993, however, counties could opt to instead count all ballots at a central location.[76] And, on July 1, 2019, Indiana *required* this practice of all counties, *see* Ind. Code § 3-11.5-1-1.1, thereby rendering the noon-receipt deadline an anachronism.

---

[74] USPS provides guidance and local assistance to election officials in setting up the Intelligent Mail Barcode system to allow voters to track their ballots. *See, e.g.*, "Steps to Creating Your Intelligent Mail Barcode," USPS 2020 Election Mail Kit 600 at pp. 7-8, https://about.usps.com/kits/kit600.pdf; "Election/Political Mail Coordinators," USPS, https://about.usps.com/gov-services/election-mail/political-mail-map.htm.

[75] *See* Ind. Code § 3-11-4-17.7.

[76] *See* IN ST Prec. 3–11.5–1–1, et sec., ELECTIONS, 1993 Ind. Legis. Serv. P.L. 3-1993 (H.E.A. 1708) (WEST) ("Pilot Project for Counting Absentee Ballots at a Central Location").

Second, any asserted state interest in requiring receipt of mail-in ballots by *any* time on Election Day is severely undermined by the state's existing process for counting mail-in ballots cast by overseas voters and postmarked on or before Election Day and adjudicating provisional ballots during the ten days following Election Day.  *See* Ind. Code §§ 3-12-1-17, 3-11.7-5-1. Even if the Court were to find that Indiana has some administrative interest in receiving mail-in ballots cast by non-overseas voters earlier in order to facilitate their prompt counting, this interest cannot be sufficiently weighty to justify the disenfranchisement of voters who cast and mail their ballots on or before Election Day and which are received while the state's existing administrative process for counting ballots is still ongoing.  That the state's interest in counting all mail-in ballots on Election Day is minimal at best is made even more evident by the IEC's suspension of this requirement for the June 2, 2020, election, in which county election boards were allowed to continue counting mail-in ballots throughout the existing ten-day period— exactly as would be required by Plaintiffs' requested relief.  *See* IEC Order 2020-37, Section 15D.

Third, the state can assert no interest in enforcing the Noon Election Day Receipt Deadline related to maintaining the integrity or uniformity of Indiana's elections.  The integrity of elections is undermined, not bolstered, by the rejection of otherwise valid ballots cast by eligible voters due to circumstances outside of their control.  Indiana voters who cast and place their ballots in the mail in time to be postmarked on or before Election Day are in no different a situation at the time they cast their vote than any other Indiana voters with respect to the information available to them concerning vote counts or election results.  The United States Supreme Court recently endorsed—indeed imposed *sua sponte*—a requirement that Wisconsin count mail-in ballots postmarked on or before Election Day in part on the basis that such a

requirement does not affect the integrity of the election process.  *Republican Nat'l Comm. v. Democratic Nat'l Comm.,* 140 S. Ct. 1205, 1207 (April 6, 2020).  In that case, brought in part to redress widespread disruption and delays in mail delivery, which prevented voters from complying with Wisconsin's 8:00 PM Election Day receipt deadline in its April 7, 2020, election, the Court struck down a District Court order requiring the counting of mail-in ballots received by six days after Election Day regardless of when they were postmarked and instead ordered that only ballots postmarked on or before Election Day may be counted.  *Id*. at 1206-08. The Court found that, while counting ballots that may have been cast *after* Election Day raises election-integrity concerns because those voters may have more information about the election results than other voters, counting ballots that can be verified to have been cast *on or before* Election Day raises no such concerns.  *Id*. at 1207.  The Court's conclusion is clear—an Election Day postmark deadline, as requested here, does not undermine the integrity of the election process. *Id*.

Likewise, any state interest in the uniform or orderly administration of elections is undermined, not advanced, by deciding whether a voter's ballot will be counted or rejected based on when it is received—which is determined by numerous factors outside the control of voters or election officials—rather than by when it was cast.

Further, Plaintiffs' requested relief—counting all mail-in ballots postmarked on or before Election Day and received within ten days following Election Day—would render Indiana's election law more uniform than Indiana's Noon Election Day Receipt Deadline.  This is because Indiana already counts the mail-in ballots of overseas voters—but not non-overseas voters—that are postmarked on or before Election Day and received within ten days after Election Day. *Compare* Ind. Code § 3-12-1-17 *with* Ind. Code §§ 3-11.5-4-3; 3-11.5-4-10.  The Noon Election

Day Receipt Deadline is also decidedly non-uniform in practice even as between non-overseas voters, because two voters can cast and mail their respective ballots on the same day, and yet one may be counted and the other rejected because they ultimately are delivered to the county election board on different days—or even at different times on Election Day.  Therefore, any state interest in ensuring the uniformity of Indiana election administration would be better served by Plaintiffs' proposed remedy than by its own existing law.  Indeed, Defendant members of the IEC's statutory duty to "[a]dopt rules" to "[g]overn the fair, legal, and orderly conduct of elections," Ind. Code § 3-6-4.1-14(a)(2), would be better fulfilled should they adopt—or should the Court order them to adopt—a rule implementing Plaintiffs' proposed remedy than by allowing continued enforcement of the Noon Election Day Receipt Deadline in the November 3, 2020, election.

Finally, Plaintiffs' requested relief does nothing to alter the overall election-administrative timeline, and Indiana has already determined that continuing to count ballots up to ten days after Election Day—and certifying the results thirteen days after Election Day[77]—is reasonable and consistent with any asserted interest in the prompt resolution and finality of its elections.

Because the burdens on voters imposed by the Noon Election Day Receipt Deadline are very substantial and not justified by any sufficiently weighty state interest, Plaintiffs are likely to succeed on the merits of their claim that the Noon Election Day Receipt Deadline violates the fundamental right to vote of Indiana voters as protected by the First and Fourteenth Amendments to the United States Constitution.  *See Crawford*, 553 U.S. at 191; *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789.

---

[77] *See* Ind. Code § 3-12-5-6.

**B. Absent an Injunction, Plaintiffs and Their Members Will Suffer Irreparable Harm and Have No Adequate Remedy at Law**

Common Cause Indiana and the Indiana State Conference of the NAACP and their members will be irreparably harmed unless the Court preliminarily enjoins enforcement of the Noon Election Day Receipt Deadline.  This harm will be suffered both through the disenfranchisement of Indiana voters who are members of each organization and through the diversion of each organizations' limited resources away from their usual voter-protection activities and toward voter education and other efforts to mitigate the disenfranchising effect of the Noon Election Day Receipt Deadline.[78]

The right to exercise free speech through the ballot is fundamental to our democracy, "and any restrictions on that right strike at the heart of representative government."  *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *see also McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1440-41 (2014).  Deprivation of a First Amendment right is presumed to constitute irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Ezell v. City of Chi.*, 651 F.3d 684, 699 (7th Cir. 2011).  This court, following the lead of many others, has explicitly concluded that a violation of the right to vote is an irreparable injury.  *See, e.g., Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1155 (S.D. Ind. 2018); *Ind. State Conference of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 663 (S.D. Ind. 2018). *See also League of Women Voters of N.C. v. North*

---

[78] Common Cause Indiana and Indiana State Conference of the NAACP each has both organizational and associational standing to seek preliminary injunctive relief against the operation of Indiana's Noon Election Day Receipt Deadline.  *See Common Cause Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019); *Id.* at 957 (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  In support of its standing to bring this case, Plaintiffs incorporate herein the entirety of the Affidavit of Julia Vaughn, Dkt. 9-7, and the entirety of the Affidavit of Barbara Bolling-Williams, Dkt. 9-8.  The Seventh Circuit recently affirmed Common Cause Indiana's organizational standing to challenge the constitutionality of provisions of the Indiana Election Code: that analysis applies with equal force here.  *Common Cause Ind.*, 937 F.3d at 949-957.

28

*Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986).

As demonstrated in the June 2, 2020, primary election, *see infra* Sections I.C., II.A., implementation of the Noon Election Day Receipt Deadline will disenfranchise Indiana voters served by the NAACP and Common Cause Indiana—including members of both organizations. Members of the NAACP and Common Cause Indiana whose mail-in ballots are rejected for reaching the county election board after the deadline, through no fault of the voter, cannot be recompensed through money damages. *See Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) (describing an inadequate remedy at law as one "seriously deficient as compared to the harm suffered"). Already, thousands of potential voters have experienced disenfranchisement via the mail deadline through no fault of their own. The denial of these voters' fundamental right to vote cannot be redressed after the election. *See League of Women Voters of N.C.*, 769 F.3d at 247 ("[O]nce the election occurs, there can be no do-over and no redress."); *Common Cause Ind.*, 327 F. Supp. 3d at 1155 ("Because an individual cannot vote after an election has passed, it is clear that the wrongful disenfranchisement of a registered voter would cause irreparable harm without an adequate remedy at law.").

In addition to wholesale disenfranchisement of potential voters, enforcement of the Noon Election Day Receipt Deadline will hurt both Common Cause Indiana and the NAACP organizationally. Both organizations will suffer injuries that cannot be "fully rectified by the final judgment after trial" and are therefore irreparable, *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am. Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008), as they will lose the ability to fully carry out their usual and expected voter protection work. Voter education and voter protection efforts, central to the missions of both organizations, are time-sensitive and

require heightened attention and dedication of already limited resources near an election.  Both

organizations anticipate having to divert capacity away from this crucial work, however, as they

expect to be inundated with concerns and last-minute problems resulting from the Noon Election

Day Receipt Deadline. Affidavit of Julia Vaughn, Dkt. 9-7, ¶¶ 11, 14-19; Affidavit of Barbara

Bolling-Williams, Dkt. 9-8, ¶¶ 14, 17-23.  This diversion of time and resources away from each

organization's usual voter-assistance and education efforts is irreparable as it cannot be recouped

after the fact; the election will be over.  *See League of Women Voters of the United States v.

Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (obstacles to the primary mission of the organization—

voter registration—deemed irreparably harmful because of lack or redressability after

registration deadlines pass); *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998,

1005 (W.D. Mo. 2018) ("Courts routinely recognize that organizations suffer irreparable harm

when a defendant's conduct causes them to lose opportunities to conduct election-related

activities, such as voter registration and education."); *E. Bay Sanctuary Covenant v. Trump*, 354

F. Supp. 3d 1094, 1116 (N.D. Cal. 2018) (serious ongoing harms to an organization's mission

may constitute irreparable harm).

### C.  The Balance of Harms Weighs Decisively in Favor of Plaintiffs and Their Members

The irreparable harms that plaintiffs will suffer absent an injunction—member

disenfranchisement and diversion of resources away from critical voter-protection activities—

vastly outweigh the slight administrative burden that would be imposed on defendants by an

injunction.  *See Girl Scouts of Manitou Council, Inc.,* 549 F.3d at 1100 (defining balancing test

as weighing the "the irreparable harm risked by the moving party in the absence of a preliminary

injunction against the irreparable harm risked by the nonmoving party if the preliminary

injunction is granted"); *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020

WL 1638374, at *13 (W.D. Wis. Apr. 2, 2020) (acknowledging the burden on the state from increased administrative tasks, but finding those outweighed by the "dilemma" faced by voters choosing between their health in a pandemic and exercising their right to vote).  In performing this sliding-scale analysis, "the court bears in mind that the purpose of a preliminary injunction is 'to minimize the hardship to the parties pending the ultimate resolution of the lawsuit.'"  *AM Gen. Corp*, 311 F.3d at 804 (quoting *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998)).  No state may deprive citizens of their constitutional right to vote "because of some remote administrative benefit," *Carrington v. Rash,* 380 U.S. 89, 95 (1965), particularly where the challenged law is not "in any sense necessary to the proper administration of its election laws." *Harman v. Forssenius,* 380 U.S. 528, 542-43 (1965).

As discussed previously, *see infra* Sections II.A., II.B., rejecting mail-in ballots that arrive after the Noon Election Day Deadline through no fault of the voter constitutes a substantial and irreparable harm to fundamental constitutional rights.  In contrast, counting mail-in ballots postmarked by Election Day and received within ten days of the election merely requires Indiana county election boards to expand practices already in use.  County election boards already rely on the postmark date when determining the validity of mail-in ballots cast by overseas voters, Ind. Code § 3-12-1-17, and already count provisional ballots and mail-in ballots cast by overseas voters during the ten days following an election.  *Id*.; Ind. Code § 3-11.7-5-1. Giving county election boards more time to count absentee ballots may even ease the administrative burdens on election personnel. Indeed, the Indiana Election Commission appears to have recognized this benefit, by extending the time that county election boards had to count absentee ballots to ten days in the June 2, 2020, primary election. IEC Order No. 2020-37.  An

injunction would align the timeline for counting mail-in ballots with the timeline already established for other ballot forms.

**D.  The Public Interest Clearly Favors Protecting the Fundamental Right to Vote by Enjoining Enforcement of the Noon Election Day Receipt Deadline**

The public interest is best served by ensuring that all eligible voters casting otherwise valid mail-in ballots on or before Election Day have their votes counted rather than rejected. "Enforcing a constitutional right is in the public interest," *Whole Woman's Health All. v. Hill*, 937 F.3d 864, 875 (7th Cir. 2019), and protecting the right to free speech is "always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).  In considering preliminary injunctive relief, courts have made clear that "the public has a 'strong interest in exercising the fundamental political right to vote.'"  *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)).  The public interest thus favors "'ensuring that qualified voters' exercise of their right to vote is successful'" and "permitting as many qualified voters to vote as possible."  *Id.* at 436 (quoting *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011)); *accord Democratic Nat'l Comm.*, 2020 WL 1638374, at *14.

Here, the Noon Election Day Receipt Deadline jeopardizes the ability of qualified voters to successfully cast their ballot.  Enjoining the deadline ensures that voters casting a mail-in ballot are not denied their fundamental rights because of delays in the postal system or the general vicissitudes of how election officials process and receive mail during a major public health crisis.  Granting preliminary injunctive relief will increase the number of qualified voters who vote successfully and prevent voters from being disenfranchised through no fault of their own.  Indiana voters and the public at large therefore have a strong interest in the Court's

enjoining the Noon Election Day Receipt Deadline in advance of the November 3, 2020,
election.

The public interest is further served by an injunction because failing to prevent the
widespread disenfranchisement of eligible voters through no fault of their own would severely
undermine public confidence in the integrity of Indiana elections.  The public has a compelling
interest in having a high degree of confidence that elections are administered fairly, that the
results are accurate, and that all eligible voters are able to cast their ballots without fear of having
their votes thrown out arbitrarily.  When voters lack this confidence, they may see no reason to
participate in elections, undermining the very foundation of democratic self-government.  *See
Crawford*, 553 U.S. at 197 ("[P]ublic confidence in the integrity of the electoral process has
independent significance, because it encourages citizen participation in the democratic
process."); *Reynolds*, 377 U.S. at 555 ("The right to vote freely for the candidate of one's choice
is of the essence of a democratic society, and any restrictions on that right strike at the heart of
representative government."); *id*. at 554-55 (recognizing constitutional right to vote includes
right of qualified voters to cast ballot and have that ballot be counted (citations omitted)).

## CONCLUSION

For the foregoing reasons, Common Cause Indiana and Indiana State Conference of the
NAACP request that the Court preliminarily enjoin Defendants and their respective agents,
officers, employees, and successors, and all persons acting in concert with each or any of them or
under their direction or control, from implementing, enforcing, administering, invoking, or
giving any effect to Indiana Code §§ 3-11.5-4-3 and 3-11.5-4-10 in the November 3, 2020,
election; and that the Court further direct Defendants Okeson, Long, Wilson Overholt, and Klutz,
in their official capacities as members of the Indiana Election Commission and pursuant to the

powers and duties of the Indiana Election Commission, as defined in Ind. Code § 3-6-4.1-14, to adopt rules, or emergency rules, requiring all county election boards and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them or under their direction or control not to reject mail-in ballots postmarked on or before November 3, 2020, and received on or before November 13, 2020, and to ensure that such ballots are counted if otherwise valid.

Dated: August 17, 2020

*s/ William R. Groth*
William R. Groth, Of Counsel
Macey Swanson LLP
445 N. Pennsylvania St., Suite 401
Indianapolis, IN 46204
Telephone: (317) 637-2345, Ext. 132
Cell: (317) 502-4803
WGroth@fdgtlaborlaw.com

*s/ Mark W. Sniderman*
Mark W. Sniderman
Findling Park Conyers Woody & Sniderman, P.C.
151 North Delaware St., Ste.1520
Indianapolis, IN 46204
(317) 231-1100
msniderman@findlingpark.com

Aneel L. Chablani (*pro hac vice forthcoming*)
Ami Gandhi (*pro hac vice forthcoming*)
Jennifer Terrell (*pro hac vice forthcoming*)
Chicago Lawyers' Committee for Civil Rights
100 North LaSalle Street
Suite 600
Chicago, IL 60602
(312) 888-4191 (tel.)
(312) 630-1127 (fax)
achablani@clccrul.org
agandhi@clccrul.org
jterrell@clccrul.org

Ezra Rosenberg (*pro hac vice forthcoming*)

Bradley Phillips (*pro hac vice forthcoming*)
Ryan Snow (*pro hac vice forthcoming*)
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW
Suite 900
Washington, DC 20005
(202) 662-8600 (tel.)
(202) 783-0857 (fax)
erosenberg@lawyerscommittee.org
bphillips@lawyerscommittee.org
rsnow@lawyerscommittee.org

*Attorneys for Common Cause Indiana and
Indiana State Conference of the NAACP*