**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| COMMON CAUSE INDIANA;<br>INDIANA STATE CONFERENCE OF THE<br>NAACP,<br><br>       Plaintiffs,<br><br>    v.<br><br>CONNIE LAWSON, in her official capacity<br>as the Indiana Secretary of State,  PAUL<br>OKESON, S. ANTHONY LONG,<br>SUZANNAH WILSON OVERHOLT, and<br>ZACHARY E. KLUTZ, in their official<br>capacities as members of the<br>Indiana Election Commission,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.: 1:20-cv-02007-SEB-TAB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**RESPONSE IN OPPOSITION TO**
**MOTION FOR PRELIMINARY INJUNCTION**

Defendants—Connie Lawson in her official capacity as Indiana Secretary of State, as well as Paul Okeson, S. Anthony Long, Suzannah Wilson Overholt, and Zachary E. Klutz in their official capacities as members of the Indiana Election Commission (together, the State)—by counsel, respectfully submit this response in opposition to Plaintiffs' Motion for Preliminary Injunction, ECF 9.

**INTRODUCTION**

"All fixed deadlines seem harsh because all can be missed by a whisker—by a day or for that matter by an hour or a minute." *Prussner v. United States*, 896 F.2d 218, 222 (7th Cir. 1990). Yet the "legal system lives on fixed deadlines; their occasional harshness is redeemed by the clarity which they impart to legal obligation.

1

'Deadlines are inherently arbitrary; fixed dates, however, are often essential to accomplish necessary results.'" *Id.* at 222–23 (quoting *United States v. Boyle*, 469 U.S. 241, 249 (1985)).

Deadlines are as necessary in the election-law context as anywhere else, *see, e.g., Nader v. Keith*, 385 F.3d 729, 734 (7th Cir. 2004), and for the last 175 years the deadline for Americans to choose their President has been the first Tuesday after the first Monday in November, *see* Presidential Election Day Act of 1845, 5 Stat. 721 (1845) (codified as amended at 3 U.S.C. § 1). Accordingly, Indiana makes polling places available for in-person voting from 6:00 a.m. to 6:00 p.m. on Election Day (this year, November 3, 2020). *See* Ind. Code § 3-11-8-8. The State also allows all voters to cast absentee ballots in person at their county clerk's office or other authorized location in the 28 days leading up to Election Day. *See id.* §§ 3-11-4-1, 3-11-10-26. And eligible voters falling into any one of thirteen separate circumstances may instead mail in their absentee ballots. *See id.* § 3-11-10-24. The State requires nearly all such ballots to arrive by noon on Election Day, *see id.* § 3-11.5-4-10, and it extends this ballot-receipt deadline by ten days only for the very small number of mail-in ballots from overseas voters, and even then only if the ballots are postmarked by Election Day, *see id.* § 3-12-1-17.

With just a few weeks to go before Election Day, Plaintiffs ask the Court to require Indiana to extend its ballot-receipt deadline to ten days after Election Day for *all* absentee-by-mail ballots—the number of which this year will be unprecedentedly

high. *See* Clifton Decl., ECF 24-1, ¶ 11. The Court should refuse to do so for three reasons.

First, Plaintiffs' argument—that the COVID-19 pandemic means Indiana's ballot-receipt deadline "imposes a very substantial burden on Indiana voters," ECF 10 at 22, and is therefore unconstitutional under *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992)—fails at the starting line because it improperly focuses on the ballot-receipt deadline alone. The Seventh Circuit has repeatedly said courts considering *Anderson/Burdick* claims "must not evaluate each clause in isolation," but must instead "look[] at the whole electoral system." *Luft v. Evers*, 963 F.3d 665, 671–72 (7th Cir. 2020) (citing *Griffin v. Roupas*, 385 F.3d 1128, 1130–32 (7th Cir. 2004)). Because Plaintiffs have not even tried to show that Indiana's voting rules are too burdensome on the whole, their claim fails at the outset.

Second, Indiana's ballot-receipt deadline is reasonable even considered in isolation. The election must end at some point, which means *some* deadline for receiving ballots must exist. A noon deadline on Election Day is as reasonable as any other; after all, the vast majority of States require absentee ballots to be received by some time on Election Day. Indiana's deadline ensures that the vast majority of ballots cast are counted on Election Day, thereby promoting public confidence in elections by allowing most races to be called on Election Day, not days or weeks later.

Third, beyond failing on the merits, Plaintiffs fail to confront the rule that federal courts "should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 1207 (2020).

Plans for this November's election are well underway and rely on longstanding, interconnected deadlines. It is far too late to change these deadlines now.

## STATEMENT OF THE CASE

1. Elections in the United States have "always been a decentralized activity," with elections administered by local officials and their rules set by state legislators. John C. Fortier & Norman J. Ornstein, *The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*, 36 U. Mich. J.L. Reform 483, 486 (2003); *c.f.* U.S. Const. art. I, § 2, cl. 1. These voting rules must balance competing interests, such as "promoting voter access to ballots on the one hand and preventing voter impersonation fraud on the other." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1168 (11th Cir. 2008); *see also Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1051 (6th Cir. 2015) (noting that election laws "balance the tension between the two compelling interests of facilitating the franchise while preserving ballot-box integrity").

In striking this balance, Indiana lawmakers have provided Hoosiers a variety of voting methods. The predominant method of voting in Indiana is in person: As another judge in this district observed in a recent election-law case, Indiana's election systems are principally "equipped for in-person voting." *Tully v. Okeson*, No. 1:20-CV-01271-JPH-DLP, 2020 WL 4926439, at *6 (S.D. Ind. Aug. 21, 2020). Accordingly, all registered voters in Indiana may vote in-person at their precinct polling places on Election Day, *see* Ind. Code § 3-11-8-2, or—using a procedure sometimes called "absentee in-person voting"—may vote in-person at various locations for the 28 days prior to Election Day, *see id.* §§ 3-11-4-1, 3-11-10-26. Alternatively, Hoosiers suffering

from an illness or injury, or caring at home for someone who is, may vote via a trav-elling voter board, which will bring a ballot to the voter's house and then return it to election officials to be counted. *See id.* § 3-11-10-25.

In addition to these in-person voting opportunities, Indiana law provides thir-teen separate circumstances under which eligible voters may instead vote via mail-in absentee ballot. *Id.* § 3-11-10-24. These circumstances include, for example, having "a specific, reasonable expectation of being absent from the county" while the polls are open on Election Day, being confined to a residence or health care facility "because of an illness or injury" while the polls are open, being scheduled to work during the entire time the polls are open, being prevented from voting due to the unavailability of transportation to the polls, being disabled, and being elderly. *Id.* And beyond these thirteen specific circumstances, Indiana has a separate set of rules authorizing mail-in absentee voting by voters who live overseas and voters who are absent from their places of residence by reason of active military duty. *See id.* §§ 3-5-2-1.5, 3-5-2-34.5, 3-11-4-5.7, 3-11-4-6.

2. Indiana allows those eligible and inclined to vote absentee-by-mail to begin sending applications for General Election mail-in absentee ballots on the first day after the Primary Election. *See* Ind. Code §§ 3-11-4-3(a), 3-11-4-6(b). Election officials cannot mail absentee ballots to eligible applicants immediately, however; they must follow a detailed process to prepare, print, and distribute ballots in the months lead-ing up to the General Election.

This process imposed a particularly tight schedule this year, because the COVID-19 pandemic led state officials to move Indiana's Primary Election from May 5, 2020, *see* Ind. Code § 3-10-1-3, to June 2, 2020, *see* 2020 IN EO 20-7. Following the primary, county election officials had about two weeks to count the votes and finalize the results, and by noon of the second following Monday (this year, June 15, 2020), the law required each circuit court clerk to send the Indiana Election Division a complete list of all candidates nominated and party convention delegates elected. *See* Ind. Code § 3-8-7-5.

But such certified reports are not the end of the process for nominating candidates for the General Election ballot. The state's political parties must still certify nominees for president and vice-president (which depends on national party nominating conventions) and attorney general (which depends on state party nominating convention) and sometimes must, by caucus, convention or other legal process, nominate candidates for other ballot vacancies. *See id.* §§ 3-13-1-2, 3-13-1-7, 3-10-2-15. So, once county officials certify their primary election results to the Election Division, the Division tabulates the results across Indiana's 92 counties and provides the State's political parties with a list of the candidates nominated. *See id.* § 3-8-7-6. The parties then had until noon on June 30, 2020, to conduct a caucus or other lawful procedure to fill any vacancies on the General-Election ballot that resulted from vacancies on the Primary-Election ballot (this rule applies to federal, state legislative, judicial, and local offices for which candidates must file a declaration of candidacy

with the Election Division or county election board and thus does not apply to candidates for statewide executive offices or president or vice president). *See id.* §§ 3-13-1-2, 3-13-1-7, 3-13-1-20.

Indiana law then provides an approximately month-long period for observers to challenge the qualifications of candidates for statewide or state legislative offices: Any such challenge must be filed with the Indiana Election Commission by noon 74 days before Election Day (this year, August 21, 2020), *see id.* § 3-8-8-3, and the Commission was required to conclude any hearing on such a challenge within three business days, *see id.* § 3-8-8-4, and announce its determination one business day after the conclusion of the hearing, *see id.* § 3-8-8-5. Any such Commission determinations could be appealed to the Indiana Court of Appeals, *see id.* § 3-8-8-6, but any such appeal that was not resolved by noon 60 days before Election Day (this year, September 4, 2020) would be terminated regardless of status, *see id.* §§ 3-8-8-7.

The deadline for the last step in finalizing the content of the General Election ballots was noon on the second Tuesday in September (this year, September 8, 2020), when the state party chairs were required to certify to the Election Division the names of their respective party's candidates for President and Vice-President of the United States. *See id.* § 3-10-4-5(c). The Election Division then had until noon on the next following Thursday (this year, September 10, 2020) to certify these candidates' names to each county election board. *See id.*

With the General Election ballots finalized, county officials could begin printing ballots. And they do not have much time to do so, because Indiana law *requires*

county officials to begin *distributing* mail-in ballots by Saturday, September 19, 2020: Absentee ballots must be printed and delivered to each county "at least fifty (50) days before a general . . . election" (this year, September 14, 2020), *see id.* § 3-11-4-15, and the counties are then required to transmit absentee ballots to eligible voters "on the day of the receipt of the voter's application . . . [or] not more than five (5) days after the date of delivery of the ballots under section 15 . . . whichever is later," *see id.* § 3-11-4-18(c)(2). Accordingly, on September 19, 2020 (five days after September 14, 2020) counties must send a mail-in ballot to any eligible voter whose application they have already received, and thenceforth must send any eligible voter a mail-in ballot on the same day they receive the voter's application.

3. With some minor exceptions not relevant here, Indiana law requires voters who are eligible to vote by mail by virtue of one of the thirteen circumstances listed in Indiana Code section 3-11-10-24 to submit applications for mail-in absentee ballots to their county election boards by 11:59 p.m. on the twelfth day before the election (this year, October 22, 2020); the State helps voters meet this deadline by allowing them to submit their applications online, by fax, by mail, by hand delivery, or by emailing a photo of a completed application. *See id.* § 3-11-4-3(a)(4); Indiana Secretary of State, *Absentee Voting: Absentee Voting By Mail*, https://www.in.gov/sos/elections/2402.htm.

As noted, county election boards must send eligible applicants their mail-in ballots either by September 19, 2020, or on the same day they receive the application, whichever is later. *See* Ind. Code § 3-11-4-18(c)(2). Voters are then responsible for

ensuring their mail-in ballots arrive at their county election board by noon on Election Day, *see id.* §§ 3-11.5-4-3, 3-11.5-4-7, 3-11.5-4-10. Again, Indiana makes it easy for voters to meet the statutory deadline: The mail-in ballot includes prepaid postage to facilitate returning the ballot by mail, *see id.* § 3-11-4-18(a), and the voter—or a member of the voter's household or the voter's attorney—may instead return the ballot in-person to the county clerk or bring the ballot to the appropriate polling location on Election Day, s*ee id.* §§ 3-11-10-1(a)(6), 3-11-10-24(c)–(d). A mail-in voter can even track whether the county election board has received the voter's mail-in ballot. *See* https://indianavoters.in.gov. And if a voter misses the ballot-receipt deadline, the voter can vote in-person at the appropriate polling place on Election Day. *See id.* §§ 3-11.5-4-18, 3-11-10-31.

In light of common sense and federal-law requirements, *see, e.g.,* 52 U.S.C. § 20302, Indiana applies a slightly different set of rules to voters who live overseas and voters who are absent from their places of residence by reason of active military duty. *See id.* §§ 3-5-2-1.5, 3-5-2-34.5, 3-11-4-5.7, 3-11-4-6. Overseas voters and military voters can submit an application for a mail-in absentee ballot by mail, fax, or email. *See id.* § 3-11-4-6; Indiana Secretary of State, *2020 Military & Overseas Voters' Guide* at 4, https://www.in.gov/sos/elections/files/2020%20Military%20and%20Overseas%20 Voters%20Guideupdate.pdf. If such applications are submitted by mail, they are subject to the same October 22, 2020 deadline that applies to other absentee-by-mail applications, but if such applications are submitted by *fax or email*, they are valid if

they are received by noon on the day before Election Day (November 2, 2020). *See id.*; Ind. Code § 3-11-4-3(a)(2)(B).

Overseas and military voters can also submit their mail-in absentee *ballots* by mail, fax, or email as well (though submitting via fax or email requires signing a statement that the voter voluntarily waives the right to a secret ballot). *See id.* § 3-11-4-6(h). If such a voter chooses to *mail* the ballot, the deadline by which it must be received turns on whether the voter is a *domestic* military voter or an *overseas* voter (whether military or civilian): Mail-in ballots from domestic military voters must meet the ordinary noon-on-Election-Day deadline, while mail-in ballots from overseas voters may be received any time before noon ten days after Election Day (November 13, 2020), so long as the ballot is postmarked on or before Election Day. *See id.* § 3-12-1-17. And if such an overseas or military voter chooses to *fax or email* the ballot, it—like other mail-in absentee ballots—must be received by noon on Election Day. *See id.* § 3-11.5-4-10.

4. As county election boards receive absentee ballots—whether mail-in absentee ballots or in-person absentee ballots—they must store the ballots in a secure location. King Decl., ECF 24-2, ¶ 4(b). Beginning as early as 6:00 a.m. on Election Day, absentee ballot counters begin the process of opening, authenticating, and counting absentee ballots. King Decl., ECF 24-2, ¶¶ 4(c). In particular, these counters evaluate ballots to determine whether they must be rejected for failing to meet state-law requirements, *see* Ind. Code §§ 3-11.5-4-13, 3-11.5-6-6, 3-11.5-8-1, and if ballot counters cannot agree whether a ballot should be counted, the question is resolved by the

10

county election board itself, *see id.* § 3-11.5-6-7. After resolving such questions, the ballot counters and county election boards tabulate the valid absentee ballots and certify the results. *See id.* §§ 3-11.5-6-18, 3-11.5-6-19, 3-11.5-6-20, 3-11.5-8-2, 3-11.5-8-3. Notably, Indiana law requires an uninterrupted count of absentee ballots, which has the practical effect of requiring that all absentee ballots be opened and tabulated on Election Day. *See id.* §§ 3-11.5-5-5, 3-11.5-6-4.

Meanwhile, precinct boards count in-person votes at the precinct polling place after the polls close. King Decl., ECF 24-2, ¶ 4(f). They submit certified results to the county election board, which aggregates them with the totals from the absentee ballot count. King Decl., ECF 24-2, ¶ 4(g).

Most counties make the unofficial results—which include absentee votes—available to the public on the evening of Election Day by uploading the results to the Statewide Voter Registration System. King Decl., ECF 24-2, ¶¶ 5–6. These unofficial results allow the "news media and other observers to identify election winners on the evening of Election Day" for the vast majority of races. King Decl., ECF 24-2, ¶ 7.

Indiana law provides for an approximately two-week period to finalize the election results. This period allows county election boards to double-check initial vote counts, resolve disputed questions, and process and count provisional ballots. *See* Ind. Code §§ 3-11-13-40, 3-11.7-5-1, 3-12-3.5-8, 3-12-4-16, 3-12-4-18. It also allows county election boards to process and count mail-in ballots from overseas voters, *see id.* § 3-12-1-17 which are processed and counted in the same manner as other mail-in ballots—they are opened, grouped together by precinct, checked for compliance with

state law, and then counted and certified, *see id.* §§ 3-11.5-6-3, 3-11.5-6-5, 3-11.5-6-6, 3-11.5-6-18, 3-11.5-6-19.

The circuit court clerks for all counties must prepare a certified, final statement of the number of votes received for each candidate no later than noon on the second Monday following Election Day (November 16, 2020), and transmit that statement to the Indiana Election Division. *See id.* § 3-12-5-6. Invariably, this deadline is just one business day after the 10-day post-Election Day deadline for receipt of overseas ballots, which always falls on a Friday.

Finally, after receiving the certified statements from the counties, the Indiana Election Division tabulates the number of votes for each candidate in each race, and the Secretary of State then certifies the candidates receiving the highest number of votes for each office to the Governor. *See* Ind. Code § 3-12-5-7. The Governor submits Indiana's formal certification of the State's presidential electors to the Archivist of the United States, *see* Ind. Code § 3-10-4-6.5, in accordance with federal law—which requires the State do so "as soon as practicable," 3 U.S.C. § 6. The Electors meet the first Monday after the second Wednesday in December (this year, December 14, 2020), *see id.* § 7; Ind. Code § 3-10-4-7, and Congress then counts the Electors' votes on "the sixth day of January," 3 U.S.C. § 15.

## STANDARD OF REVIEW

"[A]n applicant for preliminary relief bears a significant burden." *Ill. Republican Party v. Pritzker*, No. 20-2175, 2020 WL 5246656, at *2 (7th Cir. Sept. 3, 2020).

Such relief "is an extraordinary and drastic remedy," and "should not be granted un-less the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–130 (2d ed.1995)) (emphasis added in *Mazurek*).

Accordingly, a preliminary injunction should not be granted unless the party seeking the injunction satisfies four "threshold burden[s]"—(1) that it has a reasona-ble likelihood of success on the merits; (2) that it lacks an adequate remedy at law; (3) that it will suffer irreparable harm if the preliminary injunction is not awarded; and (4) that an injunction would not harm the public interest. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *see also Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). And with respect to the reasonable likelihood of success, "[i]t is not enough that the chance of success on the merits be 'better than negligible.'" *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Sofinet v. INS*, 188 F.3d 513, 514 (7th Cir. 1999)); *see also Ill. Republican Party*, 2020 WL 5246656 at *2. Rather, the party seeking the injunction must make a "strong showing" of likely success on the merits. *Id.* And requiring a strong showing on the merits is especially important where the requested preliminary injunction would prevent state officials from enforcing state laws, for "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. Of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977).

Finally, because here the requested preliminary relief would alter voting rules on the eve of an election, Plaintiffs must address "considerations specific to election cases," *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam), including whether an injunction is appropriate notwithstanding the general rule "that lower federal courts should ordinarily not alter the election rules on the eve of an election," *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 1207 (2020) (citing *Purcell*, 549 U.S. 1; *Frank v. Walker*, 574 U.S. 929 (2014); *Veasey v. Perry*, 135 S.Ct. 9 (2014)).

## ARGUMENT

Plaintiffs seek a preliminary injunction requiring Indiana to change its ballot-receipt deadline because, while that deadline is normally just fine, it is now, in light of the COVID-19 pandemic, somehow unconstitutional under the test set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). ECF 10 at 21–27. Plaintiffs fail, however, to apply *Anderson/Burdick* doctrine to Indiana's electoral system *as a whole*—as the Seventh Circuit's precedents expressly require—or even to show that, taken alone, the ballot-receipt deadline imposes an unreasonably severe burden on the right to vote. In addition, even apart from the merits, Plaintiffs have failed to show that this case falls outside the ordinary rule barring federal courts from altering state election rules on the eve of an election—which, on the date of this filing, is now only 48 days away.

## I.    Plaintiffs Have Failed to Show a Reasonable Likelihood of Success on the Merits of Their *Anderson/Burdick* Claim

As the Seventh Circuit recently explained, the *Anderson/Burdick* test is deferential to state legislative judgments: It does not "allow the judiciary to decide

whether any given election law is necessary" on the ground that unnecessary laws are "by definition an excessive burden." *Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020). On the contrary, the Supreme Court's decisions "foreclose[ ] that sort of sub-stitution of judicial judgment for legislative judgment." *Id.*

### A. The *Anderson/Burdick* claim fails because Indiana's election code as a whole imposes only reasonable burdens on voting

Courts applying the *Anderson/Burdick* test "must not evaluate each clause [of a State's election law] in isolation." *Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020). Instead, "[c]ourts weigh these burdens against the state's interests by looking at the whole electoral system. Only when voting rights have been severely restricted must states have compelling interests and narrowly tailored rules." *Id.* at 671–72 (internal citations omitted).

Plaintiffs' *Anderson/Burdick* claim fails at the outset because they have not even attempted the system-wide analysis the Seventh Circuit's precedents de-mand. Plaintiffs direct their arguments exclusively at the ballot-receipt deadline, but *Luft* precludes such fine-grained second-guessing of legislative decision-making. "In isolation, any rule reducing" the number of opportunities to vote "seems like an un-justified burden. But electoral provisions cannot be assessed in isolation. . . . One less-convenient feature does not an unconstitutional system make." *Luft*, 963 F.3d at 675. Plaintiffs have identified only a single supposedly "less-convenient feature" of Indi-ana's voting system, so their *Anderson/Burdick* theory fails from the get-go.

15

Nor could Plaintiffs have any chance of succeeding with broad-based attack on Indiana election and voting regulations. Like the Wisconsin voting system the Seventh Circuit upheld in *Luft*, Indiana "has lots of rules that make voting easier." *Id.* at 672. For example, Indiana permits everyone to cast an "in-person absentee ballot" within 28 days before Election Day, and requires county election offices to be open for such voting. *See* Ind. Code §§ 3-11-4-1, 3-11-10-26, 3-11-10-26.3. Indiana also has empowered counties to create "vote centers" that provide voters additional places to cast a ballot regardless of precinct. *See id.* § 3-11-18.1-13. Indiana even enables online voter registration and provides assistance to voters with disabilities and those unable to understand English. *See id.* §§ 3-11-9-2; 3-7-26.7-5.

And if a voter is eligible and chooses to vote absentee-by-mail, Indiana's rules allow the voter to ensure that the absentee ballot will arrive in time to be counted. Voters have already begun applying for mail-in absentee ballots, and Indiana law requires county election boards, starting on September 19, 2020, to send out mail-in absentee ballots to eligible voters on the same day it receives the voters' applications. *See id.* § 3-11-4-18. Accordingly, even presuming a *one-week* mailing delay, if a voter eligible to vote by mail submits an application on September 18, and the county election board receives it a week later on September 25, the board must, by law, mail the ballot to that voter the same day, with the ballot arriving to the voter by October 2. If the voter mails the completed ballot back a few days later—say, on October 5—and it takes another week for it to reach the board, the board will receive it on October 12, in plenty of time to be counted.

Moreover, Indiana also provides multiple options for returning a voter's mail-in absentee ballot besides depositing it in the mail. If the voter is concerned about the ballot not arriving by the deadline, the voter may return the ballot in-person to the county clerk, or the voter can bring the ballot to the appropriate polling location on Election Day and either cast it or surrender it and vote in person. *See id.* §§ 3-11-10-1(a)(6), 3-11-10-31, 3-11.5-4-18. Alternatively, a member of the voter's household or the voter's attorney may return the voter's sealed ballot, along with a supporting affidavit, on the voter's behalf. *See id.* § 3-11-10-24(c)-(d). The individual plaintiffs here neither explain why they chose not to avail themselves of these opportunities, nor specify precisely how many days before the Primary Election they mailed their ballots. *See* ECF 10 at 16–17; ECF 9-4 ¶¶ 12–13; ECF 9-5 ¶ 10; ECF 9-6 ¶¶ 7–8.

Indiana also allows voters to check whether their county election boards have received their absentee ballots by visiting https://indianavoters.in.gov/or by calling the appropriate board. And if the board has not received a voter's mail-in ballot by noon on Election Day, the voter may obtain a certificate to that effect from the county election board and then vote in-person at the appropriate polling place. *See id.* §§ 3-11.5-4.13, 3-11.5-4-21. Unlike the district court case Plaintiffs cited, where the district court found that rejecting mailed-in ballots timely received but incorrectly post-marked burdened the right to vote because incorrect postmarks are entirely out of the voter's control, *see Gallagher v. New York State Bd. of Elections*, No. 20 CIV. 5504 (AT), 2020 WL 4496849, at *16 (S.D.N.Y. Aug. 3, 2020), Indiana offers multiple ways

for voters to ensure their ballot is timely received or, if not timely received, to vote in-person.

The "net effect" of these and other Indiana voting rules has led to a turnout rate well in line with other States; for example, according to the Census Bureau, approximately 85% of Indiana's registered voters cast ballots in the November 2016 general election. *See* U.S. Census Bureau, *Voting and Registration in the Election of November 2016* (May 10, 2017), Table 4a, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html (reporting approximately 3.3 million registered voters and approximately 2.8 million votes cast in Indiana).

Because Indiana's "election code *as a whole* impose[s] only reasonable burdens," Plaintiffs' *Anderson / Burdick* claim fails. *Luft*, 963 F.3d at 671 (emphasis in original).

### B. Even considered in isolation, the Election Day Noon deadline is reasonable

Even if considered in isolation, the Election Day noon deadline does not place a severe burden on Indiana voters. The Fourteenth Amendment applies only to burdens on the right to vote imposed by the State—not burdens imposed by the pandemic, by the United States Postal Service, or anyone else. *See McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 809 n.6 (1969) (rejecting voting-rights claim because there was "nothing in the record to show that [the plaintiffs were] in fact absolutely prohibited from voting *by the State*" (emphasis added)); *see also Texas Democratic Party v. Abbott*, 961 F.3d 389, 403–04 (5th Cir. 2020) (quoting *McDonald*).

Yet in their preliminary injunction motion Plaintiffs do not argue that Indiana's ballot-receipt deadline is by itself *facially* unconstitutional—for good reason, as no court has ever suggested that such longstanding deadlines are constitutionally suspect. Because Plaintiffs cannot demonstrate that Indiana's ballot-receipt deadline itself severely burdens anyone's right to vote, they cannot establish a reasonable likelihood of success on their *Anderson/Burdick* claim.

Indiana must end the election at some point, which means some deadline for receiving ballots must exist. Indiana's receipt deadline allows the vast majority of ballots cast to be counted on Election Day, *see* King Decl., ECF 24-2, ¶ 7, which promotes public confidence in elections by allowing most races to be called on Election Day, not days or weeks later.

Because Indiana law requires an uninterrupted count of absentee ballots, all absentee ballots must be opened and tabulated on Election Day. *See* Ind. Code § 3-11.5-5-5; Ind. Code § 3-11.5-6-4.[1] This rule, together with the ballot-receipt deadline, ensures that absentee ballots are included in the initial unofficial results released to the public. And this in turn ensures that, by the end of Election Day, the public knows who has won all (or nearly all) contested races.

The public treats Election Day with a certain finality and therefore expects winners to be called by the end of the evening: If many races are not resolved on Election Day, it could thus undermine the public's faith in the electoral process. Yet

---

[1] *See also* 2020 Indiana Election Administrator's Manual at 119, https://www.in.gov/sos/elections/files/2020%20Election%20Administrators%20Manual.MovedPrimary.REVISED.June%2022%202020.pdf.

that is what Plaintiffs' proposed injunction would do. Plaintiffs acknowledge that "it is likely that an unprecedented number of Indiana voters will cast mail-in ballots in the November 3, 2020, election." ECF 10 at 7; *see also* Clifton Decl., ECF 24-1, ¶ 11. And if a significant portion of these ballots were not received by the current deadline, it could make many races impossible to call on Election Day.

The requirement that ballots be received by *noon* on Election Day is not arbitrary. It accords with Indiana's general approach to deadlines in the election context, which are often set at noon the relevant day.[2]

Moreover, Indiana is not alone in requiring mail-in ballots to be received by Election Day. In fact, the majority of States have a similar day-of-election deadline. In addition to Indiana, thirty-one other States refuse to count mail-in ballots that arrive after Election Day. Alabama requires mail-in ballots to be returned by noon on Election Day, *see* Ala. Code § 17-11-18; Louisiana requires mail-in ballots to be received by the day *before* the election, *see* La. Stat. Ann. § 18:1311; and Vermont requires mail-in ballots to be either returned to the town clerk on the day before the

---

[2] *See, e.g.*, Ind. Code 3-11-4-3 (Timely application for absentee ballot is by noon on Election Day if from a military or overseas voter and the day before if completed at the circuit court clerk office, by a military or overseas voter requesting by email or fax, or for a confined person); 3-12-6-2 (Candidate who desires a recount must submit a petition by no later than noon fourteen days after the election and a county chairman who is entitled to may request a recount no later than noon seventeen days after the election); 3-7-32-8 (A person receiving a completed registration application must file it with the proper office no later than noon 10 days after they received it); 3-10-4-5 (The names of all candidates for presidential electors, alternate presidential electors, and nominees for President and Vice President of the United States must be certified no later than noon on the second Tuesday in September before the general election and the election division shall certify to each county election board the names no later than noon the following Tuesday).

election or taken to the polling place by 7:00 p.m. on Election Day, *see* Vt. Stat. Ann. tit. 17, § 2543. Another twenty-eight States similarly require mail-in ballots to be received by some time on Election Day.[3] The prevalence of such ballot-receipt deadlines underscores the reasonableness of Indiana's rule.

Nor, contrary to Plaintiffs' suggestion, *see* ECF 10 at 25–27, is the reasonableness of this rule undermined by a minor exception for mail-in absentee ballots returned by overseas voters, *see* Ind. Code §3-12-1-17. This rule accommodates the often-lengthy time foreign postal services take to deliver mail from overseas to the United States—an accommodation that cannot be provided on the front end of the process given that counties cannot even finalize ballots earlier than 60 days prior to Election Day.

Furthermore, this rule is consistent with the special protections other provisions of Indiana law—and federal law—provide to military and overseas voters. For example, the Uniformed and Overseas Citizens Absentee Voting Act, Pub.L. 99-410, 100 Stat. 925 (1986), and the Military and Overseas Voter Empowerment Act, Pub.L. 111-84, 123 Stat. 2190 (2009), impose a variety of obligations on States to facilitate

---

[3] *See* Arizona, Ariz. Rev. Stat. Ann. § 16-547; Arkansas, Ark. Code. Ann. § 7-5-411; Colorado, Colo. Rev. Stat. § 1-7.5-107(4)(b)(II); Connecticut, Conn. Gen. Stat. § 9-158g; Delaware, Del. Code Ann. tit. 15, § 5508; Florida, Fla. Stat. § 101.67; Georgia, Ga. Code. Ann. § 21-2-386; Hawaii, Haw. Rev. Stat. § 15-5; Idaho, Idaho Code § 34-1005; Kentucky, Ky. Rev. Stat. Ann. § 117.085; Maine, Me. Stat. tit. 21-a, § 755; Massachusetts, Mass. Gen. Laws ch. 54, § 95; Michigan, Mich. Comp. Laws § 168.764a; Minnesota, Minn. Stat. § 203B.08; Missouri, Mo. Rev. Stat. § 115.293; Montana, Mont. Code. Ann. § 13-13-232; Nebraska, Neb. Rev. Stat. § 32-950; New Hampshire, N.H. Rev. Stat. § 657:22; New Mexico, N.M. Stat. Ann. § 1-6-10(C); Oklahoma, Okla. Stat. tit. 26, § 14-104; Oregon, Or. Rev. Stat. § 253.070; Pennsylvania, 25 Pa. Cons. Stat. § 3146.8(g)(1)(ii); Rhode Island, 17 R.I. Gen. Laws § 17-20-16; South Carolina, S.C. Code Ann. § 7-15-420; South Dakota, S.D. Codified Laws § 12-19-12; Tennessee, Tenn. Code Ann. § 2-6-304; Wisconsin, Wis. Stat. § 6.87(6); Wyoming, Wyo. Stat. Ann. § 22-9-118.

mail-in voting by overseas voters. *See, e.g.,* 52 U.S.C. § 20302(f) (requiring States "to transmit blank absentee ballots by mail and electronically . . . to absent uniformed services voters and overseas voters"; *id.* § 20304(b)(1) (requiring States to "facilitate the delivery of marked absentee ballots of absent uniformed services voters . . . not later than the date by which an absentee ballot must be received in order to be counted"). These federal laws are fundamentally concerned with Indiana and other States ensuring that "overseas voters [have] sufficient time to vote." *See* 52 U.S.C. § 20302(g)(1)(D)(ii). Indiana's ten-day ballot receipt furthers this laudable goal.

Plaintiffs also overstate the significance of Indiana's limited rule for overseas voters. In recent Indiana elections, overseas voters consistently accounted for a small fraction of all *mail-in* absentee ballots—much less *all* absentee ballots. In the 2020 Primary Election, for example, overseas voters accounted for less than *0.75%* of all mail-in ballots: County election boards sent out 546,720 mail-in absentee ballots in the 2020 Primary Election, yet fewer than 4,103 overseas voters even *applied* for such ballots (and even the 4,103 figure is an overestimate, for it includes the 2,235 civilian "overseas" voters and 137 "military and overseas" voters who filed mail-in ballot applications as well as 1,868 "on-going" applications, some of which were undoubtedly filed by *non*-overseas military voters who must file their mail-in ballots by noon on Election Day, *see* Ind. Code §§ 3-11-4-6(e), 3-12-1-17). King Decl., ECF 24-2, Ex. C. at 93.

The figures for the 2018 Primary and General Elections are somewhat higher but still quite small. In the 2018 Indiana Primary Election, overseas voters accounted

for no more than 4.37% of all mail-in ballots: County election boards sent out 32,936 mail-in absentee ballots, with only 1,438 applications even potentially from overseas voters (673 from "overseas" voters, 81 from "military and overseas" voters, and 684 "ongoing" applications). King Decl., ECF 24-2, Ex. A, at 93. And in the 2018 Indiana General Election, overseas voters accounted for no more than 5.45% of all mail-in ballots: County election boards sent out 149,893 mail-in absentee ballots, with only 8,163 applications potentially from overseas voters (4,075 from "overseas" voters, 248 from "military and overseas" voters, and 3,840 "ongoing" applications). King Decl., ECF 24-2, Ex. B at 93. As noted, these figures are all conservative overestimates: They include some number of "on-going" applications filed by domestic military voters, and they include *all* applications of overseas voters, even though some such applications are duplicates or otherwise invalid, and even though some overseas voters vote by email and fax and are therefore subject to the same noon-on-Election-Day rule as all other voters. *See* Ind. Code § 3-11.5-4-10.

It is reasonable for Indiana to accommodate this small number of overseas voters by allowing an extra ten days for these voters' mail-in ballots to arrive to Indiana's county election boards. This small exception accommodates the special difficulties these voters might face—an objective Congress has itself endorsed—without undermining Indiana's general interest in promoting public confidence in elections. After all, only the occasional extremely close race could be even potentially decided by the small number of late-arriving overseas ballots. Perhaps for these reasons, of the

thirty-one other States that have Election Day deadlines for ballots, ten also have extended deadlines for military and overseas ballots.[4]

At the same time, acceding to Plaintiffs' demand to count *all* mail-in absentee ballots if they are postmarked by Election Day and arrive by November 13 would run substantial risks of (1) undermining the public's confidence in election results on the evening of Election Day, and (2) overburdening absentee ballot counters and county election boards, who are responsible for authenticating and counting the absentee ballots by noon on November 16. Indiana's deadlines are thus reasonable because they balance an array of competing interests in promoting participation, deterring and detecting fraud, and achieving finality at the earliest reasonable opportunity in the vast majority of races.

## II. The *Purcell* Principle Bars the Court from Requiring Indiana to Overhaul Its Mail-In-Voting Rules on the Eve of an Election

Finally, Plaintiffs would not be entitled to a preliminary injunction even if the Court were to conclude that Plaintiffs have somehow managed to show a reasonable likelihood of success on the merits. A party seeking such extraordinary relief must

---

[4] *See*, *e.g.*, Alabama, Ala. Code § 17-11-18 (Postmarked by Election Day and delivered no later than 7 days); Arkansas, Ark. Code. Ann. § 7-5-411 (No later than 5 p.m. 10 days after the election); Colorado, Colo. Rev. Stat. § 1-8.3-113 (By close of business eight days after an election); Florida, Fla. Stat. § 101.6952 (10 days after the election); Georgia, Ga. Code. Ann. § 21-2-386 (Postmarked by Election Day and delivered no later than 3 days after Election Day); Massachusetts, Mass. Gen. Laws ch. 54, § 95 (Postmarked by Election Day and received no later than 5 p.m. 10 days after Election Day); Missouri, Mo. Rev. Stat. § 115.920 (By noon on the Friday after the election); Montana, Mont. Code. Ann. § 13-21-226 (Must be received by 5 p.m. the day after the election if transmitted electronically by 8 p.m. on Election Day, otherwise must be received by 8 p.m. on Election Day); Pennsylvania, 25 Pa. Cons. Stat. § 3511 (Postmarked by Election Day and received by 5 p.m. seven days after the election); Rhode Island, 17 R.I. Gen. Laws § 17-20-16 (Received by 4 p.m. three days after the primary or seven days after a general election).

also show that "an injunction would not harm the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *see also Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish . . . that an injunction is in the public interest.").

Courts considering whether to order last-minute changes to election laws are "required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). Injunctions altering elections rules implicate special concerns because "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5.

Accordingly, the Supreme Court "has repeatedly emphasized that lower federal courts should *ordinarily not alter the election rules on the eve of an election*." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 1207 (2020) (citing *Purcell*, 549 U.S. 1; *Frank v. Walker*, 574 U.S. 929 (2014); *Veasey v. Perry*, 135 S.Ct 9 (2014)) (emphasis added). The Seventh Circuit has frequently underscored this point as well, reiterating recently that "federal courts should refrain from changing state election rules as an election approaches." *Libertarian Party of Ill. v. Cadigan*, No. 20-1961, 2020 WL 5104251 at *4 (7th Cir. Sept. 3, 2020). Where an electoral rule is at issue—especially one that, as here, has long been enforced—courts "should carefully guard against judicially altering the status quo on the eve of an

election." *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014), *mot. to vacate stay denied*, 135 S.Ct. 9 (2014).

The relief Plaintiffs seek would require Indiana, on the eve an election, to alter its long-established election rules significantly—to move from an election system where all but a fraction of mailed-in ballots must arrive by noon on Election Day to a system where *any* ballot cast by mail postmarked by Election Day must be counted if it is received within ten days. In light of the large number of mail-in ballots that will undoubtedly be cast this year, if the Court were to grant Plaintiffs' requested relief, voters may not know the results of the election until *ten days* following the election— a significant departure from the norm that will confuse voters and possibly lead to disillusionment and decreased confidence in the electoral system. Such a change to Indiana's long-established deadline also would likely place a strain on county election officials, who may need to retain additional staff or pay existing staff overtime to count an increased number of absentee ballots arriving after Election Day in time to certify the election.

Furthermore, the deadline Plaintiffs propose would not actually help all voters in the first place. As noted, under the current system, voters can check to see if their mail-in ballots have arrived by the deadline and if they have not the voters can vote in-person at their precinct polling places. *See* Ind. Code §§ 3-11-10-31, 3-11.5-4-18. But if the deadline were extended and a voter found out his or her ballot arrived past the deadline, it would be too late for the voter to vote in-person.

In any case, the relief Plaintiffs seek is a solution in search of problem. Mail-in voting is the exception in Indiana, not the rule. The district court recognized as much in *Tully v. Okeson*, No. 1:20-cv-01271-JPH-DLP, 2020 WL 4926439 at *6 (S.D. Ind. Aug. 21, 2020). And the State is taking significant precautions to promote voter and poll worker safety on Election Day. The Secretary of State's office is "in the process of procuring and distributing over 1 million face masks, over 2 million disposable gloves, 15,000 half-gallon bottles of hand sanitizer, 2,500 gallons of surface and equipment disinfectant, tabletop sneeze guards, face shields and other PPE supplies for voters and poll workers." Clifton Decl., ECF 24-1 ¶ 8; *see also Tully*, 2020 WL 4926439 at *6. The State expects this procurement will be sufficient to protect all poll workers and up to 2 million in person voters, but the Secretary of State has financial resources "to procure and distribute additional PPE on an as-needed basis." Clifton Decl., ECF 24-1, ¶ 8. Furthermore, the Secretary of State will be distributing a manual of best safety practices for voters and poll workers based on CDC guidance, social distancing markers, and posters promoting pandemic safety precautions. Clifton Decl., ECF 24-1, ¶ 9.

Even with respect to mail-in voting, the U.S. Postal Service has taken steps to address concerns about slow mail service, sending postcards to voters across the country recommending voters "plan ahead" and submit their absentee ballot application at least fifteen days before Election Day and mail their absentee ballots at least seven days before Election Day. King Decl., ECF 24-2, Ex. D; *see also*, *e.g.*, *State v. Dejoy*,

No. 20-cv-2768-WJM-STV, 2020 WL 5513567 at *3 (D. Colo. Sept. 14, 2020) (noting that the Postal Service had sent the postcard to around 75% of voters in Colorado).

Granting Plaintiffs the relief they seek would upend long-established election rules on the eve of an election, confusing voters and placing a significant strain on the system. Such results undermine, not further, the public interest. And they clearly violate the *Purcell* principle. Accordingly, the Court should refuse to grant the preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted,

CURTIS T. HILL, JR.
Indiana Attorney General
Attorney No. 13999-20

Date: September 16, 2020     By:     Jefferson S. Garn
Deputy Attorney General
Attorney No. 29921-49


Thomas M. Fisher
Solicitor General
Attorney No. 17979-49

Kian J. Hudson
Deputy Solicitor General
Attorney No. 32829-02

Julia C. Payne
Deputy Attorney General
Attorney No. 34728-53

Courtney Abshire
Deputy Attorney General
Attorney No. 35800-49


OFFICE OF INDIANA ATTORNEY GENERAL
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Phone: (317) 234-7119
Email: Jefferson.Garn@atg.in.gov