UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| COMMON CAUSE INDIANA, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-02007-SEB-TAB |
| | ) | |
| CONNIE LAWSON, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

This lawsuit is one of several that have been filed in our district and others around the country in the runup to the November 3, 2020 general election[1] implicating the right to vote—"a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964). Here, Plaintiffs Common Cause Indiana ("CCI") and Indiana State Conference of the National Association for the Advancement of Colored People ("NAACP") have brought this action against Defendants Connie Lawson in her official capacity as Indiana Secretary of State, and Paul Okeson, S. Anthony Long, Suzannah Wilson Overholt, and Zachary E. Klutz, all in their official capacities as members of the Indiana Election Commission, challenging the constitutionality of Indiana's requirement,

---

[1] In our district, these cases include: *Common Cause Indiana v. Lawson*, ___ F. Supp. 3d ___, 2020 WL 5671506 (S.D. Ind. Sept. 22, 2020); *Common Cause Indiana v. Lawson*, ___ F. Supp. 3d ___, 2020 WL 4934271 (S.D. Ind. Aug. 24, 2020), *appeal docketed*, No. 20-2816 (7th Cir. Sept. 21, 2020); *Tully v. Okeson*, ___ F. Supp. 3d ___, 2020 WL 4926439 (S.D. Ind. Aug. 21, 2020), *appeal docketed*, No. 20-2605 (7th Cir. Aug. 24, 2020); *Frederick v. Lawson*, ___ F. Supp. 3d ___, 2020 WL 4882696 (Aug. 20, 2020); *Indiana State Conference of National Association for Advancement of Colored People v. Lawson*, 1:17-cv-02897-TWP-MPB, 2020 WL 4904816 (S.D. Ind. Aug. 20, 2020).

codified at Indiana Code §§ 3-11.5-4-3 and 3-11.5-4-10, that mail-in absentee ballots, in order to be counted, be received by noon on Election Day.  This issue, plaintiffs argue, takes on a heightened significance in the context of the ongoing devastations of the COVID-19 pandemic and the risks it presents to all citizens, constituting an undue burden on the fundamental right to vote, in violation of the First and Fourteenth Amendments to the United States Constitution.

Now before the Court is Plaintiffs' request for preliminary injunctive relief [Dkt. No. 9], filed on August 17, 2020, but not fully briefed until September 23, 2020. Specifically, Plaintiffs seek an order from the Court enjoining Defendants, and all those acting in concert with them or at their direction, from enforcing or giving any effect to Indiana Code §§ 3-11.5-4-3 and 3-11.5-4-10 in the November 3, 2020 election, thereby obviating the noon deadline for receipt and processing of the mail-in absentee ballots. Plaintiffs also request that Defendants Okeson, Long, Wilson Overholt, and Klutz, in their official capacities as members of the Indiana Election Commission and pursuant to the powers and duties of the Indiana Election Commission, as defined in Indiana Code § 3-6-4.1-14, be directed to adopt rules, or emergency rules, requiring all county election boards and all those acting in concert with them or under their direction and control, not to reject mail-in ballots postmarked on or before November 3, 2020, and received on or before November 13, 2020, and to ensure that such ballots are counted, if otherwise valid. For the reasons detailed below, we <u>GRANT</u> Plaintiff's motion.

## **Factual Background**

## **I.      Indiana Mail-In Absentee Voting Procedures**

2

This case involves the requirement under Indiana law that mail-in absentee ballots be received by noon on Election Day to be counted.  Indiana does not generally provide no-excuse mail-in absentee voting; rather, under Indiana law, eligibility to vote by mail is extended only to those voters who qualify under a list of specific circumstances.[2] Specifically, a registered voter has a statutory right to vote by mail-in absentee ballot if the voter meets one of thirteen statutory qualifications, including, *inter alia*, if the voter has "a specific, reasonable expectation of being absent from the county" while the polls are open on Election Day; is confined to a residence or health care facility "because of an illness or injury" while the polls are open; is scheduled to work during the entire time the polls are open; is prevented from voting due to the unavailability of transportation to the polls; is disabled, or is an "elderly" voter, defined as a voter who is at least 65 years of age on Election Day.  IND. CODE § 3-11-10-24(a); *see also id.* §§ 3-11-10-25, 3-5-2-16.5. In addition to these specified circumstances, Indiana has a separate set of rules authorizing mail-in absentee voting by voters who live overseas and voters who are absent from their places of residence by reason of active military duty.  *See id.* §§ 3-5-2-1.5, 3-5-2-34.5, 3-11-4-5.7, 3-11-4-6.

---

[2] Defendants highlight that Indiana's election systems are principally "equipped for in-person voting."  *Tully*, 2020 WL 4926439, at *6.  All registered voters in Indiana may vote in-person at their precinct polling places on Election Day, or at various early-voting locations for the 28 days prior to Election Day.  *See* IND. CODE §§ 3-11-8-2, 3-11-4-1, 3-11-10-26.  Alternatively, registered voters suffering from an illness or injury, or caring at home for someone who is ill or injured, may vote via a travelling voter board, which will bring a ballot to the voter's house and then return it to election officials to be counted.  *See id.* § 3-11-10-25.

Due to the serious health risks associated with the COVID-19 pandemic, members of the Indiana Election Commission expanded eligibility to vote by mail in the rescheduled June 2, 2020 primary to include any "voter who is unable to complete their ballot because they are temporarily unable to physically touch or be in safe proximity to another person,"[3] effectively allowing all Indiana voters to qualify to vote absentee.  As a result, an unprecedented number of Indiana voters cast mail-in absentee ballots. Although state election officials recently voted to withhold a similar privilege for the 2020 general election,[4] it is expected that a record number of Indiana voters eligible under the current statutory regime will cast mail-in absentee ballots in the November 3, 2020 general election in order to avoid the risks of contracting COVID-19 from engaging in in-person voting.

Indiana voters satisfying the eligibility requirements to vote by absentee ballot can apply online to vote by mail, by mailing or hand delivering a physical application form to their county election board, or by emailing an image of their completed application to county officials or the state.  IND. CODE § 3-11-4-3(a)(4); Indiana Secretary of State, *Absentee Voting: Absentee Voting by Mail*, https://www.in.gov/sos/elections/2402.htm. Voters may apply as early as the conclusion of the previous election; in fact, Indiana has

---

[3] Ind. Election Comm'n, Order No. 2020-37, Concerning Emergency Provisions Affecting the 2020 Indiana Primary Election, Section 9A (Mar. 25, 2020), *available at* https://www.in.gov/sos/elections/files/Indiana%20Election%20Commission%20Order%202020-37.pdf

[4] There is an ongoing federal lawsuit pending before our colleague, the Honorable J.P. Hanlon, in which the plaintiffs allege that the State's failure to permit no-excuse mail-in absentee voting, particularly given the COVID-19 pandemic, violates voters' constitutional rights.  Judge Hanlon's recent decision denying the plaintiffs' request for preliminary injunctive relief in that case is currently on appeal to the Seventh Circuit.

been accepting applications to vote by mail in the November 3, 2020 general election since the June 2, 2020 primary concluded.  Under Indiana law, an application to vote via mail-in absentee ballot must be received by the proper county election board or other appropriate official by 11:59 p.m. on the twelfth day before election day, which is October 22, 2020 for the November 3, 2020 election.  *Id.* § 3-11-4-3(a)(4)(A).  For presidential elections, federal law requires states to allow voters "who may be absent from their election district or unit in such State on the day such election is held" to apply "not later than seven days immediately prior to such election," 52 U.S.C. § 10502(d), which is October 27, 2020 for the November 3, 2020 election.

No later than forty-five days prior to Election Day, county election officials must begin mailing ballots to voters whose applications have been approved as of that date.  *See* IND. CODE § 3-11-4-15 (requiring ballots to be delivered to each county at least fifty days prior to election day); *id.* § 3-11-4-18(c)(2) (requiring ballots to be sent within five days of delivery of the ballots to the county).[5]  For voters applying within forty-five days

---

[5] Following the primary election, election officials in Indiana began a detailed process to prepare the general election ballots so they could be printed and distributed within the statutory deadline. By noon of the second Monday following the primary election (this year, June 15, 2020), after counting the primary votes and finalizing the results, county election officials were required to send the Indiana Election Division a complete list of all candidates nominated and party convention delegates elected. IND. CODE § 3-8-7-5.  The Election Division then tabulated the results across Indiana's 92 counties and provided the State's political parties with a list of the candidates nominated because the parties must certify nominees for President and Vice-President (which depends on national party nominating conventions) and attorney general (which depends on state party nominating conventions) as well as, in some cases, nominate candidates for certain ballot vacancies by caucus, convention, or other legal process. *See id.* § 3-8-7-6.  Once the vacancy filling process is complete, Indiana law provides for a period of time in which observers may challenge the qualifications of candidates for statewide or state legislative offices.  Any such challenge must be filed with the Indiana Election Commission by noon, 74 days before Election Day (this year, August 21, 2020), and the Commission must conclude any hearings on

of election day, Indiana law requires that county officials mail the ballot "on the day of the receipt of the voter's application." *Id.* § 3-11-4-18(c)(1).  Thus, this year, on September 19, 2020, Indiana counties were required by law to send a mail-in ballot to every eligible voter whose application they had already received, and, going forward, are required to send eligible voters their mail-in ballots on the same day each application is received.  The ballot must be mailed to the voter "postage fully prepaid." *Id.* § 3-11-4-18(a).  If a voter has not received their ballot "after a reasonable time has elapsed for delivery of the ballot by mail," the ballot is "destroyed, spoiled, [or] lost," or the voter makes an error on their ballot, they may request that a replacement ballot be sent to them by filing a statement with their county election board.  *Id.* § 3-11-4-17.7.

After a voter receives and completes their ballot, it can be returned by mail using the prepaid return envelope.[6]  Once the United States Postal Service ("USPS") takes custody of the completed ballot, the ballot is transported to a mail facility for processing, where it is marked with an official postmark or other marking indicating the date on

---

such challenges within three business days and announce its determination the following business day.  *Id.* §§ 3-8-8-3, -4, -5.  The Commission's determinations can be appealed to the Indiana Court of Appeals, but any such appeal that is not resolved by noon, 60 days before Election Day (this year, September 4, 2020) was to be terminated regardless of status.  *Id.* § 3-8-8-6, -7.  The state party chairs are required to certify to the Election Division by noon on the second Tuesday in September (this year, September 8, 2020), the names of their respective party's candidates for President and Vice-President of the United States.  The Election Division has until noon on the following Thursday (this year, September 10, 2020) to certify those candidates' names to each county election board, which is the last step in finalizing the content of the General Election ballots.  *Id.* § 3-10-4-5(c).

[6] Voters voting by absentee ballot also have the option to return their ballot in-person to the appropriate county clerk or to bring the ballot to the appropriate polling location by noon on Election Day.  If, for some reason, the voter is personally unable, a member of the voter's household or the voter's attorney may return the voter's ballot using either of these two methods.  IND. CODE §§ 3-11-10-1(a)(6), 3-11-10-24(c)–(d).

which the USPS took custody of the ballot.  In Indiana, for a mail-in absentee ballot to be counted, it must be received by the county election board "before noon on election day," regardless of the date on which it was cast and mailed by the voter.[7]  IND. CODE §§ 3-11.5-4-3; 3-11.5-4-10.  Accordingly, the postmarked date of the ballot has no bearing on whether it will be deemed timely.  If a voter misses the ballot-receipt deadline, the voter can vote in-person at the appropriate polling place on Election Day.  *Id.* §§ 3-11.5-4-18, 3-11-10-31.  But voters typically are not informed of whether their ballots arrived on or before the deadline.

Indiana law does provide that "[e]ach ballot *may* be assigned a unique tracking number as prescribed by the election division using IMb [Intelligent Mail Barcode] Tracing or a similar automated tracking method to provide real-time tracking information for the envelope containing the ballot.  As used in this subsection, 'IMb Tracing refers to a real-time mail tracking service offered through the United States Postal Service." IND. CODE § 3-11-4-18(a) (emphasis added).  Counties are not *required*, however, to make their ballot envelopes trackable, and, so far as we have been informed, no Indiana counties currently do so.  Absentee voters are able to track the date the county clerk's office received their application for an absentee ballot, the date the ballot was mailed to the voter, and, once it is returned, the date the clerk's office received it at

---

[7] This contrasts with some other states' laws governing mail-in voting deadlines which use the postmark or other USPS marking for the purpose of adjudicating the timeliness of a ballot.  *See, e.g.*, Ohio, R.C. § 3509.05 (counts ballots received within ten days if postmarked at least one day prior to election day); Kansas, K.S.A. 25-1132 (counts ballots received within three days if postmarked on or before election day); Illinois, 10 ILCS 5/19-8, 10 ILCS 5/18A-15 (counts ballots received within fourteen days if postmarked on or before election day).

https://indianavoters.in.gov, but unless a county chooses to utilize IMb Tracing or similar technology, absentee voters cannot track the progress of their absentee ballot in real-time and consequently are in the dark about whether their ballots were received by the noon deadline and thus were counted.

Indiana applies a slightly different set of rules to voters who live overseas and to voters who are absent from their places of residence by reason of active military duty. IND. CODE §§ 3-5-2-1.5, 3-5-2-34.5, 3-11-4-5.7, 3-11-4-6. Overseas voters and military voters can submit an application for a mail-in absentee ballot by mail, fax, or email. *See id.* § 3-11-4-6; Indiana Secretary of State, *2020 Military & Overseas Voters' Guide*, at 4, https://www.in.gov/sos/elections/files/2020%20Military%20and%20Overseas%20Voters %20Guideupdate.pdf. If such applications are submitted by mail, they are subject to the same October 22, 2020 deadline that applies to other absentee-by-mail applications, but if the applications are submitted by fax or email, they are valid if received by noon on the day before Election Day (this year, November 2, 2020). *Id.*; IND. CODE § 3-11-4-3(a)(2)(B).

Under Indiana law, overseas and military voters can submit their mail-in absentee ballots by mail, fax, or email.[8] *Id.* § 3-11-4-6(h). If the voter is a domestic military voter, regardless of the method by which they return their ballot, the ballot must arrive by noon on Election Day to be counted, just like other mail-in absentee ballots. This same deadline applies to overseas voters, whether military or civilian, who chose to return their

---

[8] If such voter chose to submit their ballots via fax or email, they are required to sign a statement indicating that they voluntarily waive their right to a secret ballot. IND. CODE § 3-11-4-6(h).

ballots by fax or email.  However, the deadline is extended for overseas voters who return their ballots by mail.  Mail-in ballots from overseas voters may be received any time before noon, ten (10) days after Election Day (this year, November 13, 2020), so long as the ballot is postmarked on or before Election Day.  *Id.* §§ 3-11.5-4-10, 3-12-1-17.

As county election officials receive absentee ballots, whether by mail or delivered in-person, they are required to store the ballots in a secure location.  King Decl. ¶ 4(b).  Beginning as early as 6:00 a.m. on Election Day, absentee ballot counters commence the process of opening, authenticating, and counting absentee ballots.  *Id.* ¶ 4(c).  This process requires ballot counters to evaluate each absentee ballot to determine whether it meets all state-law requirements to be counted.  *See* IND. CODE §§ 3-11.5-4-13, 3-11.5-6-6, 3-11.5-8-1.  If ballot counters cannot agree whether a ballot should be counted, the county election board makes the final determination.  *Id.* § 3-11.5-6-7.  After any such issues are resolved, the ballot counters and county election boards tabulate the valid absentee ballots and certify the results.  *Id.* §§ 3-11.5-6-18, 3-11.5-6-19, 3-11.5-6-20, 3-11.5-8-2, 3-11.5-8-3.  Indiana law requires an uninterrupted count of absentee ballots, so once the process begins, it continues until all absentee ballots are opened, authenticated, and tabulated.  *Id.* §§ 3-11.5-5-5, 3-11.5-6-4.

Meanwhile, precinct boards count in-person votes at the precinct polling place after the polls close.  King Decl. ¶ 4(f).  They submit certified results of their counts to the county election board, which aggregates them with the totals from the absentee ballot count.  *Id.* ¶ 4(g).  Most counties make the unofficial results, including absentee votes, available to the public on the evening of Election Day by uploading the results to the

Statewide Voter Registration System.  *Id.* ¶¶ 5–6.  These unofficial results are shared with the public and generally allow the "news media and other observers to identify election winners on the eve of Election Day" for most races.  *Id.* ¶ 7.

Indiana law provides for an approximately two-week period following election day to finalize election results, during which time county election boards confirm initial vote counts, resolve disputed questions, and process and count provisional ballots as well as mail-in ballots from overseas voters.  *See* IND. CODE §§ 3-11-13-40, 3-11.7-5-1, 3-12-3.5-8, 3-12-4-16, 3-12-4-18, 3-12-1-17.  Mail-in ballots from overseas voters are processed and counted in the same manner as other mail-in ballots, meaning they are opened, grouped together by precinct, checked for compliance with state law, and then counted and certified.  *See id.* §§ 3-11.5-6-3, 3-11.5-6-5, 3-11.5-6-6, 3-11.5-6-18, 3-11.5-6-19.

After the counties have finalized their election results, the circuit court clerk in each county must prepare, no later than noon on the second Monday following Election Day (this year, November 16, 2020), a certified, final statement of the number of votes received for each candidate and must then transmit that statement to the Indiana Election Division.  IND. CODE § 3-12-5-6.  This deadline invariably falls one business day after the ten-day post-Election Day deadline for receipt of overseas ballots, which always falls on a Friday.

Upon receipt of the certified statements from the counties, the Indiana Election Division tabulates the number of votes for each candidate in each race, and the Secretary of State then certifies the candidates receiving the highest number of votes for each office

10

to the Governor.  IND. CODE § 3-12-5-7.  Federal law then requires the Governor to submit Indiana's formal certification of the State's presidential electors to the Archivist of the United States "as soon as practicable."  3 U.S.C. § 6; *see also* IND. CODE § 3-10-4-6.5.  The Electors meet the first Monday after the second Wednesday in December (this year, December 14, 2020), (3 U.S.C. § 7) and Congress tabulates the Electors' votes on "the sixth day of January."  *Id.* § 15.

## II.  The COVID-19 Pandemic

As all have come to know, COVID-19 is an infectious viral disease caused by a novel coronavirus that has rapidly and widely spread throughout the world.  The virus that causes COVID-19 is highly contagious and spreads through a variety of means, including especially via respiratory droplets and physical contacts between individuals.[9] Individuals contracting the virus can experience a range of symptoms, from none at all, to including flu-like issues, suffering a severe immune system response that can cause fluid to build in the lungs and ultimately lead to death.[10]  Containing the virus is made even more difficult by the fact that asymptomatic and pre-symptomatic individuals, who are likely unaware that they themselves are infected, can infect others with whom they come into contact just as those who do show symptoms.[11]  While COVID-19 poses a

---

[9] Ctrs. for Disease Control & Prevention, *What You Should Know About COVID-19 to Protect Yourselves and Others* (Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

[10] *See, e.g.*, Stokes EK, Zambrano LD, Anderson KN, *et al.*, *Coronavirus Disease 2019 Case Surveillance – United States, January 22–May 30, 2020*, Morb. Mortal Wkly. Rep. 69, 759–765 (June 19, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6924e2-H.pdf.

[11] *See* Furukawa, Brooks & Sobel, *Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic*, EMERG. INFECT. DIS. Vol. 26, No. 7 (May 4, 2020), *available at* https://wwwnc.cdc.gov/eid/article/26/

potentially severe health risk to all individuals, public health experts have warned that it can be particularly dangerous for certain demographics, including older people, people with underlying medical conditions, and people of color.[12]

On March 13, 2020, President Donald J. Trump declared a national state of emergency as a result of the widespread outbreak of COVID-19.  Within one week of that announcement, forty-eight states, including Indiana, had declared local states of emergency.  The virus has continued to spread throughout the United States since then, resulting in a higher number of infections and deaths worldwide than any other country. As of this date, approximately 7,129,313 people in the United States have been infected with the coronavirus and at least 204,598 have died from the virus nationwide.[13]  In Indiana, 119,066 people have tested positive and at least 3,385 have died.[14]

The COVID-19 pandemic has also had a significant impact on the 2020 election cycle within many states, including Indiana, who have postponed elections due to stay-at-home orders or changed or suspended state laws governing certain aspects of elections

---

7/20-1595_article. *See also S. Bay United Pentecostal Church v. Newsom,* 140 S. Ct. 1613 (May 29, 2020) (Roberts, C.J, concurring in the denial of application for injunctive relief) ("At this time, there is no known cure, no effective treatment, and no vaccine. Because people may be infected but asymptomatic, they may unwittingly infect others.").

[12] Ctrs. for Disease Control & Prevention, *Racial and Ethnic Minority Groups* (Apr. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html; Ctrs. for Disease Control & Prevention, *Health Equity Considerations and Racial and Ethnic Minority Groups* (July 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html.

[13] *Coronavirus Disease 2019 (COVID-19) Cases and Deaths in the U.S.,* Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html (last updated Sept. 29, 2020).

[14] Ind. COVID-19 Dashboard, Ind. COVID-19 Data Report, https://www.coronavirus.in.gov/2393.htm (last updated Sept. 28, 2020).

because of the virus.  Because the risk of infection in locations where large numbers of people congregate is substantial, unprecedented numbers of voters voted by mail-in absentee ballot in Indiana's June 2 primary election.  In addition, although Indiana has not extended the privilege of no-excuse mail-in voting for the November 3 general election, the parties agree that a record number of those voters who are statutorily eligible to do so are expected to make that choice to avoid the risk of contracting the COVID-19 virus.[15]

## III.  Indiana's June 2, 2020 Primary Election

As discussed above, the COVID-19 pandemic had a significant impact on Indiana's administration of the 2020 Primary Election.  In separate orders issued on March 25 and April 17, 2020, Defendant members of the Indiana Election Commission ("the Commission") postponed the Primary Election from May 5 to June 2, 2020.[16] Those orders also suspended and modified numerous statutory deadlines to accommodate the postponement, including extending the time within which county election officials were required to complete the counting of mail-in ballots from Election Day to ten days

---

[15] We note that the Secretary of State's office is "in the process of procuring and distributing over 1 million face masks, over 2 million disposable gloves, 15,000 half-gallon bottles of hand sanitizer, 2,500 gallons of surface and equipment disinfectant, tabletop sneeze guards, face shields and other PPE supplies for voters and poll workers," which the State expects will be sufficient to protect all poll workers and up to 2 million in-person voters.  Clifton Decl. ¶ 8.  The Secretary of State also has financial resources "to procure and distribute additional PPE on an as-needed basis." *Id.*  In addition, the Secretary of State will be distributing a manual of best safety practices for voters and poll workers based on CDC guidance, social distancing markers, and posters promoting pandemic safety precautions. *Id.* ¶ 9.

[16] Ind. Election Comm'n, Order No. 2020-37, Concerning Emergency Provisions Affecting the 2020 Indiana Primary Election (Mar. 25, 2020), *available at* https://www.in.gov/sos/elections/ files/Indiana%20Election%20Commission%20Order%202020-37%20(002)%20g.pdf; Ind. Election Comm'n, Order No. 2020-40, Concerning Emergency Provisions Affecting the 2020 Indiana Primary Election (April 17, 2020), *available at* https://www.in.gov/sos/elections/files/ Order%202020-40%20Draft%20PDF.pdf.

after Election Day.[17]  The requirement that mail-in absentee ballots be received by noon on Election Day in order to be counted was not modified, however.

The Commission also significantly expanded eligibility to vote by mail in the Primary Election, construing the phrase "voters with disabilities" in Indiana Code § 3-11-10-24(a)(4) to include "any voter who is unable to complete their ballot because they are temporarily unable to physically touch or be in safe proximity to another person," effectively extending eligibility to vote by mail to all Indiana voters as a result of the COVID-19 pandemic.[18]  At the same time, the Commission reduced in-person voting options, granting county election boards discretion to "reduce and consolidate the number of polling locations and poll workers needed to conduct an election on election day" and to provide fewer vote centers for the June 2 election than required under existing law.[19] The Commission's orders also prohibited early in-person voting except between Tuesday, May 26 and noon on Monday, June 1, reducing the total number of early voting days in all early voting locations from 27 days to 6 days.[20]

As a result of these actions by the Commission in response to the COVID-19 pandemic, an unprecedented number of Indiana voters cast mail-in ballots in the June 2, 2020 election.  Statewide, nearly 550,000 voters requested mail-in ballots, which was more than ten times the number requested in the 2016 presidential primary, despite the

---

[17] *See* Ind. Election Comm'n, Order No. 2020-37, Section 15D.
[18] Ind. Election Comm'n, Order No. 2020-37, Section 9A.
[19] Ind. Election Comm'n Order No. 2020-37, Section 12.
[20] Ind. Election Comm'n Order No. 2020-37, Section 13 (permitting counties to provide one vote center for every 25,000 active voters instead of 10,000 active voters as provided by IND. CODE § 3-11-18.1-6).

lack of a competitive presidential primary in Indiana for either party in 2020.  This surge

in mail-in voting led to documented delays in the transmission of ballots to voters as well

as from voters back to election officials.  Because of these delays, thousands of otherwise

valid ballots were rejected in the 2020 Primary Election because they arrived at county

election offices after noon on Election Day.  For example, in Marion County, Indiana, a

total of 1,514 otherwise valid ballots were rejected despite having been postmarked on or

before June 2, 2020; in Hamilton County, 435 such ballots were rejected.  Prein Decl. ¶¶

4, 7.  These two counties together represent 20% of the population of Indiana.

Marilyn Tawney, Crystal Hammon, and Diana Smith were all among the voters

who had their ballots rejected for missing the noon deadline on Primary Election Day.

Ms. Tawney, who has used the absentee mail-in ballot process ever since turning 65 years

old, requested a mail-in ballot for the June 2020 Primary Election in order to reduce

congestion at the polls and avoid potential exposure to the COVID-19 virus.  Tawney

Decl. ¶¶ 6–11.  Although Ms. Tawney mailed her ballot approximately four days before

the election, it was not received until after the noon deadline and was therefore not

counted.  *Id.* ¶¶ 12–15.  Ms. Hammon requested a mail-in ballot because she knew she

would be out of town on the day of the 2020 Primary Election.  Hammon Decl. ¶¶ 6–7.

Ms. Hammon received her mail-in ballot approximately one week before June 2, 2020,

and despite her prompt completion and mailing of her ballot a few days before the

election, it was rejected for arriving after the noon deadline.  *Id.* ¶¶ 9–12.  Ms. Smith is

71 years old and requested a mail-in ballot because she was concerned about being

exposed to the COVID-19 virus if she voted in person, but later learned that her ballot had been rejected for late arrival.  Smith Decl. ¶¶ 2, 6–10.

## IV.   The Impact of COVID-19 and Operational Changes on the USPS

The COVID-19 pandemic has also significantly affected the USPS.  Thousands of postal workers have contracted the virus, dozens have died, and tens of thousands have had to quarantine for two weeks after being exposed.  The combination of this staffing strain on the USPS and the surge in mail-in voting during the pandemic has led to disruptions to mail delivery, including delays and lost or undelivered mail-in ballots in states nationwide, including in Indiana.

Since the June 2, 2020 election, the USPS has also made several significant changes to its operating procedures that have further impacted delivery reliability and speed, thereby increasing the time for a mail-in ballot to travel through the mail system in advance of the November 3, 2020 general election.  For example, citing an effort to reduce costs and improve efficiency, Louis DeJoy, on June 16, 2020, less than a month after taking over as Postmaster General, circulated an internal USPS memorandum alerting postal workers to prepare for "difficult" policy changes.  Changes that took effect on July 13, 2020 included the elimination of overtime for postal workers and the imposition of limits on other measures local postmasters use to ameliorate staffing shortages, as well as limits on the number of stops individual mail trucks are permitted to make along a route.  Postal employees were also instructed to leave mail behind at the end of a workday to be delivered the following day, instead of making multiple trips, if necessary, to ensure timely delivery, as had previously been the USPS's longstanding

policy.[21]  Within weeks of the institution of these changes, postal workers nationwide were reporting noticeable delays and election officials began instructing voters to return their ballots in person rather than by mail to ensure they were timely.

On August 4, 2020, the USPS contacted the Indiana Secretary of State by letter, advising her that certain deadlines under Indiana law for requesting and casting mail-in ballots "may be incongruous with the Postal Service's delivery standards" under current conditions.  Dkt. 9-1.  The letter goes on to state that "to the extent that the mail is used to transmit ballots to and from voters, there is a significant risk that, at least in certain circumstances, ballots may be requested in a manner that is consistent with [Indiana's] election rules and returned promptly, and yet not be returned in time to be counted."  *Id.* at 2.  In particular, the letter highlighted "a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted under [Indiana's] laws as we understand them."  *Id.* at 1.

Three days later, on August 7, 2020, Postmaster DeJoy announced a hiring freeze and a request for voluntary early retirements of postal workers, effectively preventing the alleviation of existing staffing shortages resulting from the pandemic.[22]  During the week following this announcement, it was reported that the USPS had begun removing mail sorting machines from postal distribution centers across the country, ultimately

---

[21] Jacob Bogage, *Postal Service Memos Detail 'Difficult' Changes, Including Slower Mail Delivery*, Washington Post (July 14, 2020), https://www.washingtonpost.com/business/2020/07/14/postal-service-trump-dejoy-delay-mail/.

[22] Press Release, *Postmaster General Louis DeJoy Modifies Organizational Structure to Support USPS Mission*, USPS Postal News (Aug. 7, 2020), https://about.usps.com/newsroom/national-releases/.

decommissioning 671 high-volume sorting machines, together capable of sorting 2.4 million pieces of mail per hour, which accounted for one-eighth of USPS nationwide capacity.  This reduction in mail processing capacity included a 20% to 40% reduction in the number of sorting machines located at facilities in the Great Lakes region, including significant reductions in Indiana.[23]

## V.   Plaintiffs

### A.   Common Cause Indiana

Plaintiff Common Cause Indiana ("CCI") is the Indiana affiliate of Common Cause, a national non-profit, non-partisan grassroots organization that advocates in favor of ethics, good government, campaign finance reform, constitutional law, and the elimination of voting barriers.  Vaughn Aff. ¶ 3.  CCI has only one employee, Policy Director Julia Vaughn, who is responsible for policy development, lobbying, grassroots organizing, and coalition building.  *Id.* ¶ 7.  CCI has at least 15,000 members across Indiana who are eligible to vote in state and federal elections in Indiana and who support CCI in a variety of ways, including lobbying their elected officials in support of CCI's mission, building coalitions with other community organizations in support of CCI's policy goals, volunteering to assist CCI's efforts to protect Indiana voters' access to the ballot on Election Day, and providing financial support.  *Id.* ¶ 8.  According to Ms.

---

[23] "Equipment Reduction Plan" at 2-4, 7, 12, USPS, May 15, 2020, https://assets.documentcloud.org/documents/7035434/USPS-Equipment-Reduction-Plan.pdf. The acronyms in this document correspond with various types of high-volume mail sorting machines employed by USPS. *See* USPS "List of Acronyms/Abbreviations," https://about.usps.com/publications/pub32/pub32_acn.htm.

Vaughn, CCI anticipates that at least some of its 15,000 members will have their mail-in absentee ballots rejected as untimely because of delays caused by county election boards being faced with pandemic conditions and vastly greater volumes of absentee ballot applications and USPS delivery challenges. *Id.* ¶ 20.

As part of CCI's core mission, it works on a nonpartisan basis to expand and protect equal access to voting for all Indiana citizens in a variety of ways, including lobbying for nonpartisan election reforms, such as the expansion of early voting, the implementation of no-excuse absentee voting, increasing the number of voting locations, and ensuring a fair, nonpartisan redistricting process, among other reforms; working with state and local election officials in advance of the November 2020 general election to address and remedy certain election administration issues experienced in the June 2020 primary election; partnering with other community organizations to provide education and training to on-the-ground voting rights activists around the state; and working with other community organizations to track problems at voting sites on Election Day, fielding calls from voters who experience burdens in their efforts to exercise their right to vote, and providing assistance to such voters by lobbying local election officials and/or facilitating their access to counsel. *Id.* ¶ 5.

On Election Day, CCI and its volunteers work with the nonpartisan Election Protection Project, which manages an Election Day hotline for voters to call if they face barriers at their polling locations. CCI spends time and resources training its volunteers to assist such voters on Election Day, including providing written materials for volunteers to use as well as training its volunteers in advance of Election Day, either in person, by

phone, or virtually. *Id.* ¶ 10. Because of the vast increase in numbers of voters choosing to vote by absentee ballot in light of the COVID-19 pandemic, CCI devoted additional time and resources toward educating volunteers about the effects of the noon Election Day receipt deadline in advance of its efforts to protect eligible Indiana residents' right to vote in the June 2, 2020 primary election (and expects to do the same for the November 3, 2020 general election), thereby diverting such time and resources from other activities CCI would have otherwise undertaken to advance its mission. *Id. ¶* 11.

Before the primary election, Ms. Vaughn received a number of telephone calls from voters seeking advice because they were concerned their ballots would not be received by noon on Election Day and thus would not be counted. Beginning a week before the primary election, CCI posted on social media, including Twitter and Facebook, messages intended to warn voters not to mail their ballots but instead to hand deliver them to the election office or county courthouse. Following the primary election, she received additional calls from voters wondering if their votes had been counted. In response, Ms. Vaughn was required to revamp the Election Protection Project training, devoting an inordinate amount of time to educating volunteers on how to assist voters facing problems with mail-in ballots, including those ballots arriving too late to return by mail for fear of missing the noon Election Day deadline. Ms. Vaughn and CCI volunteers spend considerable time developing the curriculum and presentation materials for these educational sessions, and the time and resources devoted to updating such training to address the effects of the noon Election Day receipt deadline has diverted from

CCI's other advocacy efforts.  Ms. Vaughn anticipates being required to engage in similar efforts in advance of the November 3, 2020 general election.  *Id.* ¶ 12, ¶ 15.

CCI has also worked with others to persuade the Governor, Secretary of State, and Indiana Election Commission to relax the noon deadline to avoid similar levels of disenfranchisement that occurred by virtue of its enforcement in the primary election. This advocacy has included attending coalition meetings, sending letters to these elected officials, sharing information on social media, and sending messages to its members to encourage them to contact the Governor and Secretary of State.  CCI will continue its efforts to educate its members and the public about the noon Election Day receipt deadline for mail-in absentee ballots in the runup to the general election.  *Id.* ¶ 13, ¶ 19.

CCI has a limited budget to engage in its advocacy efforts and promote its mission; thus, it is required to make difficult choices regarding the uses of its limited resources.  *Id.* ¶ 9.  By increasing the risk that some voters will have their mailed absentee ballots rejected because they arrived belatedly, the noon Election Day receipt deadline harms CCI's mission of reducing barriers to voting and imposes additional burdens on CCI that divert time and resources from lobbying and advocacy efforts on other issues, including, but not limited to, no-excuse absentee voting, nonpartisan redistricting reform, and expanding access to early voting.  *Id.* ¶ 14.

### B.    Indiana State Conference of the NAACP

The Indiana State Conference of the NAACP is a nonpartisan, nonprofit organization chartered in 1940 by the NAACP Board of Directors and currently based in Gary, Indiana.  The NAACP was founded by a racially and religiously diverse group of

people with the purpose of assisting African-American citizens to ensure political, educational, social, and economic equality of rights for all persons and to fight against racial discrimination.  The Indiana State Conference of the NAACP currently has approximately 5,000 members, the majority of whom are residents of Indiana, registered to vote in Indiana, and participate in many aspects of the political process.  National NAACP members affiliate with a local unit, and all local units in Indiana are members of the Indiana State Conference.  Bolling-Williams Aff. ¶¶ 5–6.

Barbara Bolling-Williams is the President of the Indiana State Conference of the NAACP, a position she has occupied since 2003, and serves on the 64-member board of the NAACP National Board of Directors.  Her responsibilities as President include coordinating the statewide activities of Indiana's local units, including the local branches, college chapters, and youth council; supporting the civic engagement work of local units, including their voter education and outreach, and communicating regularly with local units about their voter registration and education activities.  *Id.* ¶¶ 2–4.

The Indiana State Conference of the NAACP is run entirely by volunteers. Members promote the NAACP's mission in a variety of ways, including by lobbying elected officials to support or oppose relevant pending legislation; staffing committees that support the NAACP's work on specific issue areas, such as health, economic empowerment, environmental climate justice, criminal justice, political action, education, and youth services; providing NAACP-led trainings in these areas, including trainings related to civil empowerment; and providing financial support.  *Id.* ¶ 7.

With regard to voting rights, throughout its history, the NAACP's mission has been to promote civic engagement by educating voters, monitoring polls, and facilitating voter registration. Local units of the NAACP have supported this mission through a myriad of activities, including, *inter alia*, training and coordinating volunteers to identify problems at polling places and Election Day and following up with local election boards or national vote watch groups to address such issues; hosting nonpartisan candidate forums and providing information regarding how well various candidates are responding to issues important to the NAACP; offering rides to the polls on Election Day; providing voter education trainings to churches and community groups; assisting elderly voters with applying for absentee ballots; conducting voter registration drives at high schools; assisting voters with verifying their registration status to ensure they have not been purged from voter rolls; conducting door-to-door voter outreach efforts; and litigating to protect voters' rights. *Id.* ¶ 8. With no paid staff and a limited budget, the NAACP always faces challenging decisions regarding the manner in which to expend its limited financial resources, decisions made even more difficult in the midst of the COVID-19 pandemic. *Id.* ¶ 15.

The COVID-19 pandemic has resulted in conditions that have made it potentially unsafe for many voters to vote in person, including many members of the NAACP who are African-American and are disproportionately impacted by the disease, resulting in a heavier reliance on the absentee ballot process to provide a safe, alternative means to exercise the right to vote. Before the June 2020 primary election, the NAACP expended time and resources beyond what it had planned and what it had expended in the past to

23

educate voters about the mail-in option and encourage its use.  *Id.* ¶ 10.  According to Ms. Bolling-Williams, as a result of the noon Election Day deadline and uncertainties related to USPS mail delivery speeds, the NAACP must now reeducate its members and other voters about the risks associated with voting by mail in advance of the November 3, 2020 general election, diverting its resources away from its other voter education and protection activities.  *Id.* ¶ 14.

Traditionally, the NAACP's voter education and volunteer training programs have focused on topics such as voter intimidation, stemming voter misinformation, the use of provisional ballots, and resources for addressing problems or issues faced on Election Day.  Now, however, the NAACP must reduce time spent on these topics to instead explain how best to ensure a mail-in absentee ballot gets counted.  Because of the COVID-19 pandemic, the NAACP has had to alter its traditional methods of conducting outreach and educating voters because schools and churches, where the NAACP generally engages in such activities, are not in session.  The NAACP has pivoted to other methods of sharing its information that are often time-restricted, including the use of robocalling and radio spots, and have had to disproportionately focus their messaging on the noon Election Day deadline with the aim to decrease the disenfranchisement caused by the deadline in the June 2020 primary.  *Id.* ¶¶ 14, 16–18.

The NAACP plans to conduct virtual trainings for volunteer pollwatchers before the November 3, 2020 general election.  Although it has never before included such information in these trainings, this year it will be required to include information regarding absentee ballots and the noon Election Day deadline, which will divert time

from other important training topics.  *Id.* ¶ 21.  In addition, the NAACP will be asking its members to contact the Governor, Secretary of State, and the Indiana Election Commission, asking that the noon deadline be relaxed in the general election, which will require the engagement of additional volunteers.  *Id.* ¶ 22.

The NAACP also anticipates engaging in additional work on November 3, 2020 in response to the noon Election Day deadline that will decrease its ability to engage in other voter protection activities.  For example, the NAACP anticipates needing to use its volunteers to drive out to voters' residences to pick up absentee ballots that would otherwise not be timely received by the county election board and deliver those ballots to the county board before noon.  Volunteers may need to be diverted from watching the polls to provide such carrier services, incurring gas costs, along with their lost time.  *Id.* ¶ 19.

According to Ms. Bolling-Williams, given the pandemic conditions and the resulting increase in the filing of absentee ballot applications in Indiana, the Indiana Conference of the NAACP expects that some of its 5,000 members will receive their mail-in ballots too late to successfully complete and return them before noon on Election Day, as a result of delays in processing the applications and in delivery by the USPS.  *Id.* ¶ 24.

## VI.     The Instant Litigation

Plaintiffs filed their complaint in this action on July 30, 2020, alleging that Indiana's requirement that mail-in ballots be received by noon on Election Day in order to be counted results in the disenfranchisement of thousands of voters, who, through no

fault of their own, have their ballots disallowed.  As such, the "in by noon to count" deadline constitutes an undue burden on the fundamental right to vote in violation of the First and Fourteenth Amendments to the United States Constitution.  On August 17, 2020, Plaintiffs moved for a preliminary injunction enjoining Defendants from enforcing the noon deadline for mail-in ballots and requiring that all mail-in ballots postmarked on or before November 3, 2020, and received on or before November 13, 2020, be counted, if otherwise valid.  That motion is now before the Court.

<u>**Legal Analysis**</u>

**I.     Preliminary Injunction Standard**

To obtain a preliminary injunction, the moving party must demonstrate: (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; and (3) irreparable harm absent the injunction.  *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012).  If the moving party fails to demonstrate any one of these three threshold requirements, the injunctive relief must be denied.  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)).  At this stage of the analysis, "the court decides only whether the plaintiff has any likelihood of success—in other words, a greater than negligible chance of winning …."  *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002).

If these threshold conditions are met, the Court must then assess the balance of the harm—the harm to Plaintiffs if the injunction is not issued against the harm to

Defendants if it is issued—and determine the effect of an injunction on the public interest. *Girl Scouts*, 549 F.3d at 1086. "The more likely it is that [the moving party] will win [their] case on the merits, the less the balance of harms need weigh in [their] favor." *Id.* at 1100. The public interest consideration is particularly significant in this case as the Supreme Court has cautioned that, "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion …. As an election draws closer, that risk will increase." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006). We have moved with haste to hand down a decision in this case in an effort to reduce such a risk of voter confusion.

## II.   Discussion

### A.   The *Anderson-Burdick* Test

Our assessment of Plaintiffs' claim is governed by the two-step analysis set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), which the Supreme Court has stated applies to all First and Fourteenth Amendment challenges to state election laws. *Burdick v. Takushi*, 504 U.S. 428, 432–34 (1992); *see also Acevedo v. Cook Cty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019) (recognizing that the Supreme Court in *Burdick* emphasized that the standard set forth in *Anderson* "applies to *all* First and Fourteenth Amendment challenges to state election laws") (emphasis in original). Under the *Anderson-Burdick* standard, a court addressing a challenge to a state election law "must weigh 'the character and magnitude of the asserted injury to the rights protected by First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'

taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

Under this standard, the level of scrutiny applied to the challenged restriction "depends on the extent of its imposition: 'the more severely it burdens constitutional rights, the more rigorous the inquiry into its justifications.'" *Acevedo*, 925 F.3d at 948 (quoting *Libertarian Party of Ill. v. Scholz*, 872 F.3d 518, 523–24 (7th Cir. 2017)). "'Nondiscriminatory restrictions that impose only slight burdens are generally justified by the need for orderly and fair elections,' whereas severe burdens must be 'narrowly tailored to serve a compelling state interest.'" *Id.* (quoting *Scholz*, 872 F.3d at 524). Nevertheless, "[h]owever slight [the] burden may appear, … it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008)).

The Seventh Circuit recently applied the *Anderson-Burdick* test to a series of challenges to Wisconsin's election laws in *Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020). "Fundamentally, the *Luft* court cautioned that the burden of a specifically challenged election provision must be considered against 'the state's election code as a whole'—that is, by 'looking at the whole electoral system,' rather than 'evaluat[ing] each clause in isolation.'" *Democratic Nat'l Committee v. Bostelmann*, ___ F. Supp. 3d ___ , 2020 WL 5627186, at *14 (W.D. Wis. Sept. 21, 2020) (quoting *Luft*, 963 F.3d at 671), *appeal docketed*, Nos. 20-2835 & 20-2844 (7th Cir. Sept. 23, 2020), *stay conditionally granted* (Sept. 27, 2020).  However, *Luft* also reaffirmed that "the right to vote is personal"; thus,

28

"the state must accommodate voters" who are unable to meet the state's voting requirements "with reasonable effort."  963 F.3d at 669.

### B.    Likelihood of Success on the Merits

Here, Plaintiffs challenge Indiana's requirement that mail-in absentee ballots, in order to be counted, be received by noon on Election Day.  They claim that requiring receipt of mail-in ballots specifically by *noon* on Election Day, while rejecting those received later in the day, is an arbitrary and anachronistic practice, originally instituted when Indiana law required mail-in ballots to be validated and counted at each individual precinct on Election Day, which requirement arguably supported an interest in the early receipt of such ballots so as to facilitate their transport to numerous locations throughout each county.  However, effective July 1, 2019, Indiana now requires that each county count mail-in absentee ballots at a central location, thereby eradicating the need for transportation of the ballots and the noon-receipt deadline.

This requirement, Plaintiffs argue, takes on a heightened significance in the context of the ongoing challenges presented by the COVID-19 pandemic, including the well-publicized delays in USPS mail delivery, as thousands of Indiana voters are at risk of being disenfranchised through no fault of their own because, even if they comply with Indiana's absentee ballot application deadline and diligently complete and return their ballot upon receipt, there is still a significant likelihood that the ballot will not reach their county election board by noon on Election Day.  Thus, Plaintiffs claim that, in this context, the noon Election Day receipt deadline constitutes an undue burden on the

fundamental right to vote, in violation of the First and Fourteenth Amendments to the United States Constitution.

Defendants rejoin that deadlines are necessary in the election context to ensure the orderly and effective administrative of elections in the State, and, here, the burden imposed by the noon Election Day receipt deadline is mitigated by other voter-friendly provisions in Indiana's election code, particularly the numerous alternatives apart from mailing that absentee voters may use to return their ballots so as to ensure their timely receipt.  Defendants further claim that, whatever the severity of the burden, the State cannot be held responsible for disallowed ballots arriving after the noon deadline because it is the COVID-19 pandemic and the USPS that are its cause, not the absentee ballot receipt deadline.  Moreover, Defendants argue, the insubstantial burden placed on voters is outweighed by the State's interests in promoting the public's confidence in the electoral system by ensuring prompt election results and not overburdening local election officials and county election boards.

We address the parties' respective arguments in turn below.

### 1.    Severity of the Burden

We turn first in our analysis to address the severity of the burden at issue. Plaintiffs argue that the burden imposed by the noon Election Day deadline is substantial, and, on the preliminary record before us, we agree with that assessment.  There is no dispute that a record number of absentee ballots were requested and cast in Indiana's June 2, 2020 primary election, and, although the State has not extended the privilege of no-excuse absentee voting for the November 3, 2020 general election, the parties agree that

an unprecedented number of those statutorily eligible to do so are expected to cast their ballots again by mail in the general election as a result of the COVID-19 pandemic. Plaintiffs have presented evidence, which Defendants have not materially challenged, that this surge in mail-in absentee voting, coupled with delays and disruptions in USPS mail delivery, resulted in well-documented delays in the primary election, both in the delivery of blank absentee mail-in ballots to voters and the return of completed ballots to election officials, and it is likely to result in similar delays in the November 3, 2020 general election.

Plaintiffs have further shown, at least on this preliminary record, that, as a result of these delays, Indiana voters can be—and in fact have been—disenfranchised by the noon Election Day receipt deadline, despite complying with the deadline imposed by Indiana law for requesting absentee ballots and promptly completing and returning their ballots upon receipt.  In the 2020 primary election, in Marion County and Hamilton County alone (two out of Indiana's 92 counties which together represent 20% of Indiana's population), 1,949 otherwise valid mail-in absentee ballots postmarked on or before the date of the election were rejected for not having arrived by noon on Election Day. Reasonably extrapolated, this evidence suggests that the burden on thousands of Indiana voters who are at risk of being disenfranchised in the November 3, 2020 general election based on factors largely outside their control is very substantial.  The USPS itself has warned the State that it cannot guarantee delivery of mail within a specific time frame and that "certain [of Indiana's] deadlines for requesting and casting mail-in ballots may be incongruous with the Postal Service's delivery standards.  This mismatch creates a risk

that ballots requested near the deadline under state law will not be returned by mail in time to be counted under your laws as we understand them." Dkt. 9-1 at 1.

Defendants' rejoinder regarding the severity of the burden at issue is threefold. Specifically, Defendants first argue that Plaintiffs' claim fails at the outset because they have not shown that Indiana's election code as a whole is overly burdensome, as required by the Seventh Circuit in *Luft v. Evers*; second, that, even if considered in isolation, the burden imposed by the noon Election Day receipt deadline is reasonable because it is mitigated by the fact that Indiana law permits alternative methods for returning absentee ballots that allow voters to ensure their ballots are timely received, regardless of mail delivery delays; and third, that it is only those burdens on the right to vote imposed by the State that are actionable, and here, whatever burden has been imposed is attributable to the COVID-19 pandemic and/or the USPS, not the State. We address these arguments in turn below.

With regard to Defendants' first argument, to the extent that Defendants claim that the Seventh Circuit held in *Luft* that successfully challenging any specific provision of a state's election code requires a plaintiff to show that the state's entire electoral system is too burdensome, we do not understand that to be an accurate interpretation of the court's holding or the relevant legal standard.[24] Rather, *Luft* instructs that, in assessing the

---

[24] In *Luft*, where various provisions of Wisconsin's electoral system were at issue, the Seventh Circuit affirmed certain parts of the lower court's ruling invalidating specific portions of Wisconsin's election code, despite recognizing that the electoral system as a whole "has lots of rules that make voting easier," including several provisions more lenient than Indiana's which entitle employees to three hours off from work to vote, provide for longer poll hours, and permit voters to register at the polling place immediately before casting a ballot. 963 F.3d at 672.

burden imposed by a specific election rule, the challenged provision must be considered in "interaction … with the election system as a whole" to assess whether other, more lenient, provisions in the code help to ameliorate that burden.  963 F.3d at 671.

Applying this standard to the facts before us leads us to Defendants' second argument in defense of the constitutionality of the noon Election Day receipt deadline, to wit, that the burden imposed by the deadline is mitigated by other provisions in Indiana's election code, particularly those sections affording absentee voters alternative means of returning their ballots apart from the mail, and is thus a reasonable requirement. Defendants highlight various general provisions of Indiana law that facilitate voting, including those that permit all voters to cast an "in-person absentee ballot" within 28 days before Election Day and requiring county election offices to be open for such early voting, Ind. Code §§ 3-11-4-1, 3-11-10-26, 3-11-10-26.3; that empower counties to create "vote centers" to provide voters additional locations to cast an in-person ballot regardless of precinct, *id.* § 3-11-18.1-13; and that offer online voter registration and assistance to voters with disabilities and those unable to understand English, *id.* §§ 3-11-9-2, 3-7-26.7-5.

More importantly, Defendants argue, Indiana's election rules allow voters who are eligible and choose to vote by mail-in absentee ballot to ensure that their ballots are received by the current noon Election Day deadline, even accounting for USPS delivery delays, as long as such voters promptly complete and return their ballots upon receipt and do not wait until the end of the statutory window provided under Indiana law for

requesting absentee ballots.[25]  If absentee voters are still concerned that their mail-in absentee ballot will not reach the county election board by noon on Election Day, Indiana law permits such voters to return their absentee ballot in person to the county clerk or the appropriate polling location on Election Day and either cast it or surrender it and vote in person.  IND. CODE §§ 3-11-10-1(a)(6), 3-11-10-31, 3-11.5-4-18.  Alternatively, a member of the voter's household or the voter's attorney may return the voter's sealed ballot, along with a supporting affidavit, on the voter's behalf.  *Id.* § 3-11-10-24(c)–(d). Finally, Defendants point to the fact that, at noon on Election Day, absentee voters can either call their county election board or check https://indianavoters.in.gov to determine whether their ballot has been received, and if it has not arrived, the voter may obtain a certificate to that effect from the county election board and then vote in-person at the appropriate polling place to prevent being disenfranchised.  IND. CODE §§ 3-11.5-4-13, 3-11.5-4-21.

Although it is true, as Defendants highlight, that Indiana's electoral system provides a number of alternatives to voting by mail-in absentee ballot, the problem is that

---

[25] As discussed above, the statutory period to apply for mail-in absentee ballots has already begun and Indiana law requires county election boards, beginning on September 19, 2020 and continuing through October 22, 2020, the last date on which a voter may request an absentee ballot under Indiana law, to send out mail-in absentee ballots to eligible voters on the same day such voters' applications are received.  Accordingly, Defendant argues, even presuming a one-week mailing delay, if a voter eligible to vote by mail submitted their application on September 18, for example, it would have been received by the county election board on September 25 and sent back out that same day, with the ballot arriving to the voter by October 2.  Assuming the voter were to take a few days to complete the ballot, sending it back to the county election board on October 5, it would be received by the board on October 12, in plenty of time to be counted. This hypothetical of course assumes that the voter applied for their absentee ballot more than one month before the State's deadline.

all the alternative methods of voting or returning an absentee ballot cited by Defendants require the voter (or another member of the household, assuming there is one, or the voter's attorney, assuming the voter has one) to go in person to a polling place or to the county clerk's office.  Appearing in person is an option not available to many absentee voters, who may be disabled, seriously ill, homebound, out of the state, or remaining sequestered at home to avoid COVID-19's devastation.  Indeed, as Plaintiffs point out, these are often the very circumstances that render such voters eligible to and desirous of voting by mail in the first place.

Even for those absentee voters who are physically able to travel to a county office or polling place, the earliest point at which such a voter could learn that their mail-in ballot had not been received by the statutory deadline, at least without the aid of a real-time ballot tracking system, would be noon on Election Day, and that assumes there is no lag time in updating that information on the State's website.  We find it highly unlikely that a voter in that position, who was eligible to vote by absentee ballot and thus presumably unavailable to vote in person for one of the enumerated statutory reasons, could, immediately upon learning that their mail-in ballot had not been received, travel in person to their local election office to obtain the necessary certification that their ballot was not received on time, and then travel to their precinct polling location to vote in person by 6:00 p.m.  Even if technically possible, this clearly is not a workable solution for the vast majority of the potentially thousands of voters at risk of being disenfranchised by the noon on Election Day receipt deadline.

It is obviously possible, as Defendants argue, for mail-in absentee voters to ensure that their ballots are received in time, even accounting for USPS delivery delays, by requesting their absentee ballots weeks in advance of the State's deadlines and then promptly completing and returning their ballots.  Indeed, voters nationwide are being encouraged to do just that[26] and, hopefully Hoosier voters eligible to and desirous of voting by mail-in absentee ballot will follow that advice.  However, given the unprecedented number of mail-in ballots expected to be cast in the November 3, 2020 election, there can be little doubt that a significant number of "seemingly prudent, if unwary, would-be voters will not request an absentee ballot far enough in advance to allow them to receive it, vote, and return it for receipt by mail before the election day deadline despite acting well in advance of the deadline for requiring a ballot." *Bostelmann*, 2020 WL 5627186, at *21.  Defendants do not materially dispute this.

Still others may intentionally wait until closer to Indiana's October 22, 2020 statutory deadline for requesting their absentee ballot, not as a result of dilatoriness, but because they are undecided and therefore not ready to vote well in advance of the end of the presidential campaign or because Indiana's deadline "is giving them a false sense of confidence in timely receipt." *Id.*  Defendants' attempt to minimize the burden imposed by the noon Election Day receipt deadline on such voters by arguing that they could have prevented the problem by requesting their absentee ballot weeks in advance of the

---

[26] The USPS, for example, has taken steps to address concerns regarding slow mail service, including sending postcards to voters across the country recommending they "plan ahead" and submit their absentee ballot application at least fifteen days before Election Day and mail their absentee ballots at least seven days before Election Day.  King Decl., Exh. D.

statutory deadline or by choosing instead to vote or return their ballot in person is unavailing.  As Plaintiffs argue, the State cannot offer absentee voting by mail and then tell voters who choose it and abide by the statutory rules that they should have chosen differently because of delays over which they have no control.  For these reasons, we are not persuaded that the burden on voters imposed by the noon Election Day receipt deadline is mitigated by other provisions in Indiana's election code.

Nor are we persuaded by Defendants' third and final argument, to wit, that Plaintiffs' claim fails because, regardless of the severity of the burden imposed by the noon Election Day receipt deadline, it is the COVID-19 pandemic and the vagaries of the USPS mail delivery schedule, not the State, that have caused the burden.  As discussed above, the undisputed record demonstrates in this case that voters eligible to vote by mail-in absentee ballot who wait even up to several days before Indiana's October 22, 2020 deadline to request an absentee ballot, whether because they are unaware of the potential risk of doing so, were undecided earlier in the presidential campaign, or for some other reason, face a significant likelihood that their ballots, even if timely returned upon receipt, will not be received by election officials on or before the current deadline. Thus, Indiana's "election system sets [such voters] up for failure in light of the near certain impacts of this ongoing pandemic." *Id.*  Under these circumstances, we cannot say that the State bears no responsibility for the burden caused by the current absentee ballot receipt deadline or the voter's disenfranchisement.

In sum, the undisputed evidence, at least at this preliminary stage of these proceedings, establishes that the burden imposed by Indiana's noon Election Day receipt

deadline, which threatens to disenfranchise thousands of eligible absentee voters for reasons that, because of the COVID-19 pandemic, are outside their control, is very substantial.  That burden is not sufficiently mitigated even when considered against Indiana's election code as a whole because voters who either must or choose to use a mail-in ballot in the November 3, 2020 general election have no practical alternative to vote if their ballot has not been received by noon on Election Day.

### 2.    State Interests

Against this burden, we must balance the interests of the State in enforcing the challenged deadline.  Regarding the State's interests, Defendants argue that *some* deadline for receiving ballots must exist and that the noon Election Day receipt deadline Indiana imposes is both in line with other of its deadlines in the election context, many of which are set at noon on the relevant day, and one which also permits the vast majority of ballots cast to be counted on Election Day.  Defendants maintain that the challenged deadline is therefore not arbitrary and promotes public confidence in elections by allowing most races to be called on Election Day, rather than days or weeks later.  Given the unprecedented number of absentee ballots expected to be cast in the general election this year, Defendants claim that if Plaintiffs' requested relief is granted, and a significant portion of those ballots are not received by noon on Election Day, it could make many races impossible to call by the end of the night, potentially undermining the public's faith in the electoral process.

Additionally, Defendants cite their concern that counting all eligible mail-in ballots if they are postmarked by Election Day and arrive by November 13 runs a

substantial risk of overburdening absentee ballot counters and county election boards, who are responsible for authenticating and counting the absentee ballots by noon on November 16. The burden imposed by the noon Election Day receipt deadline is thus reasonable and justified under the *Anderson/Burdick* test, Defendants argue, because it balances "an array of competing interests in promoting participation, deterring and detecting fraud, and achieving finality at the earliest reasonable opportunity in the vast majority of races." Defs.' Resp. at 24.

For the following reasons, we find these interests as identified by Defendants to be insufficient in outweighing or justifying the burden the challenged deadline places on mail-in absentee voters' fundamental right to vote. Initially, while the State's interests in promoting voter participation and detecting and deterring fraud are no doubt significant, it is neither self-evident nor have Defendants presented any evidence to establish how the noon Election Day receipt deadline either promotes such participation or assists in preventing voter fraud. Nor is there any evidence before us to support the conclusion that extending the current deadline as Plaintiffs request would result in decreased voter participation or an increased risk of voter fraud. Such a claim is further belied by the fact that the State has long-counted provisional ballots and overseas voters' absentee ballots during the ten-day period following Election Day, apparently without incident. Defendants "may not simply invoke the phrase 'election integrity' without further explanation" and expect those incantations to carry the day. *Common Cause Ind. v. Lawson*, ___ F. Supp. 3d ___, 2020 WL 5671506, at *6 (S.D. Ind. Sept. 22, 2020); *see also Fish v. Schwab*, 957 F.3d 1105, 1133 (10th Cir. 2020), *petition for cert. filed*, (U.S.

Aug. 3, 2020) (No. 20-109) (holding that, while the State clearly has an interest in preventing voter fraud, there must be evidence "that such an interest made it necessary to burden voters' rights").

We turn next to address Defendants' stated interest in prompt election results, which Defendants contend promotes the public's confidence in the electoral system. Initially, we note that Defendants' concern that granting Plaintiffs' requested relief will prevent races from being called on the night of the election, even considering the expected increase in the number of mail-in absentee voters, will arise only in close races. More importantly, Defendants have not shown how ensuring that all otherwise valid absentee ballots cast by Election Day are counted threatens to undermine public confidence in the legitimacy of the final results; rather, it should in fact help assuage such concerns. Granting Plaintiffs' requested relief will not require an extension of the State's current deadlines for finalizing and certifying election results, within which time Indiana law already permits provisional ballots and overseas absentee ballots postmarked by Election Day and arriving within ten days following the election to be counted.  Defs.' Resp. at 11 ("Indiana law provides for an approximately two-week period to finalize the election results.").  Moreover, in the 2020 primary election, while the noon Election Day receipt deadline was not extended, the time period for counting mail-in absentee ballots received by the deadline was extended past Election Day by the Commission, apparently without the concern that undecided races would lower the public's confidence in the electoral process.

Nor will Indiana be "an anomaly" if Plaintiffs' requested relief is granted as several states count absentee ballots that arrive within a specified period of time following the election, if timely postmarked. *See Bostelmann*, 2020 WL 5627186, at \*21 ("[S]ome fourteen states, other than Wisconsin and the District of Columbia, follow a postmark-by-election-day rule (or a close variant) and count ballots that arrive in the days following the election, so long as they are timely postmarked.").  In any event, in light of the high volume of absentee ballots expected nationwide because of the COVID-19 pandemic, it is likely that election results will not be final on Election Day in many states, and the fact that Indiana could be among them is not a sufficient concern to justify the level of disenfranchisement likely to be caused by the noon Election Day receipt deadline.

Finally, while we acknowledge and appreciate Defendants' concern that election officials and county election boards will be overwhelmed and greatly burdened by the requirement that otherwise valid mail-in absentee ballots postmarked by Election Day and received by November 13 be counted before the November 16 certification deadline, this burden is lessened by the fact that Indiana county election boards will not need to create a process for doing so out of whole cloth; rather they need only expand procedures already employed to process and count provisional ballots and mail-in ballots cast by overseas voters during the ten days following an election.  We acknowledge, as Defendants argue, that there are comparatively few overseas absentee ballots; thus, counting such ballots within ten days after the election is a fairly modest undertaking. However, even assuming that some county election boards will be required to retain

41

additional staff to assist in counting the additional mail-in absentee ballots postmarked by Election Day and arriving by November 13, we find that this additional administrative strain is not so compelling as to outweigh the burden faced by voters who, even if they comply with Indiana's statutory deadline for requesting absentee ballots and promptly return those ballots, may still be disenfranchised by the enforcement of the challenged law.

Election Day is set by law as November 3—*all day* on November 3 until the polls officially close. Any voter casting a ballot has the right to do so within that time frame. The noon Election Day receipt deadline disadvantages—indeed, disenfranchises—voters who vote by mail-in ballot by cutting short the time period within which they are permitted to exercise this right even though, due to the COVID-19 pandemic, ensuring the timely delivery of their ballots is outside their control. To do so without a sufficiently weighty state interest constitutes an undue burden on the fundamental right to vote in violation of the First and Fourteenth Amendments. The State's asserted interests here are insufficient to justify such disenfranchisement, given that the system already has a built-in safety valve timeframe within which to receive and process all otherwise valid mail-in ballots cast on Election Day and arriving by November 13. Accordingly, we hold that Plaintiffs have shown a likelihood of success in demonstrating the risk of disenfranchisement of thousands of Indiana votes due to the noon Election Day receipt deadline outweighs any interest of the State during the COVID-19 pandemic and is therefore unconstitutional as applied in this context.

### B.   Irreparable Harm and Inadequate Remedy at Law

Having established a likelihood of success on the merits of their claim that the noon Election Day deadline places an undue burden on the fundamental right to vote in violation of the First and Fourteenth Amendments, Plaintiffs now must show that, without preliminary injunctive relief, they will suffer irreparable harm for which there is no adequate remedy of law.  "[H]arm is considered irreparable if it 'cannot be prevented or fully rectified by the final judgment after trial.'"  *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017) (quoting *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1089).  To establish that they have no adequate remedy at law, Plaintiffs must show that any award would be "seriously deficient as compared to the harm suffered."  *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003).

Plaintiffs argue they will be irreparably harmed absent preliminary injunctive relief on two fronts: first, through the likely disenfranchisement of Indiana voters who are members of each organization, and second, through the diversion of their limited resources away from their usual voter-protection activities to focus instead on voter education and other efforts to mitigate the disenfranchising effect of the noon Election Day deadline.  Both organizations represent that they have already had to divert valuable time and resources from other efforts so as to focus on educating their volunteers and members regarding the risk of mail-in absentee ballots being rejected for failure to meet the absentee ballot receipt deadline.

It is well-established that "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm…."  *Preston v. Thompson*, 589 F.2d 300, 303 n.3

(7th Cir. 1978).  Moreover, the Seventh Circuit has long held that First Amendment violations presumptively cause irreparable harm, *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006), and "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases).  Plaintiffs also have no adequate remedy at law because neither the diversion of resources nor the infringement on the fundamental right to vote can be redressed by money damages or other traditional legal remedies.  *Christian Legal Soc'y*, 453 F.3d at 859 ("The loss of First Amendment freedoms is presumed to constitute irreparable injury for which money damages are not adequate…."); *League of Women Voters of N.C.*, 769 F.3d at 247 ("[O]nce the election occurs, there can be no do-over and no redress.").  Accordingly, Plaintiffs have satisfied their burden to show that, absent injunctive relief, they will suffer irreparable harm for which no adequate legal remedy exists.

## C.  Balancing of Harms and the Public Interest

Finally, "the court must compare the potential irreparable harms faced by both parties to the suit—the irreparable harm risked by the moving part in the absence of a preliminary injunction against the irreparable harm risked by the nonmoving party if the preliminary injunction is granted," *Girl Scouts of Manitou Council, Inc*, 549 F.3d at 1100. This balancing also requires consideration of whether an injunction would be in the public interest.  *Id.*

Here, the irreparable harms that Plaintiffs will suffer absent an injunction, namely, likely member disenfranchisement and diversion of resources away from critical voter-

protection activities, are, as discussed more fully above, very significant.  On the other hand, Defendants claim that issuance of an injunction requiring the counting of all mail-in absentee ballots, if they are postmarked by Election Day and received by November 13, 2020, would both undermine the public's confidence in election results on the eve of Election Day and overburden absentee ballot counters and county election boards, who are responsible for authenticating and counting the absentee ballots by noon on November 16, 2020.

Regarding Defendants' first contention, as discussed above, rather than undermining the public's confidence in the election results, ensuring that all otherwise valid absentee ballots cast by Election Day are counted should instead *strengthen* the public's confidence in the legitimacy of the final results.  As to Defendants' second argument, while we appreciate that there will be an increased burden placed on election officials by the requirement that otherwise valid mail-in absentee ballots postmarked by Election Day and received by November 13 be counted, as we previously explained, this burden is lessened by the fact that Indiana county election boards will need only to expand procedures already used to process and count provisional ballots and mail-in ballots cast by overseas voters during the ten days following an election.  Accordingly, this additional administrative strain does not outweigh the irreparable harm faced by Plaintiffs.

Finally, we find that an injunction is in the public interest.  It is well-established that, as a general matter, "[e]nforcing a constitutional right is in the public interest," *Whole Women's Health All. v. Hill*, 937 F.3d 864, 875 (7th Cir. 2019), and "[t]he public

interest … favors permitting as many qualified voters to vote as possible." *Obama v. Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). Defendants argue, however, that an injunction altering Indiana's longstanding absentee ballot receipt deadline would not be in the public interest here given the proximity of the November 3, 2020 general election, which, as of the date of this entry, is 35 days away. Defendants claim that, in light of the large number of mail-in ballots that will undoubtedly be cast this year, if the Court were to grant Plaintiffs' requested relief, voters may not know the result of the election until ten days later, "a significant departure from the norm that will confuse voters and possibly lead to disillusionment and decreased confidence in the election system." Defs.' Resp. at 26.

We are mindful, as Defendants emphasize, that the Supreme Court has cautioned that courts considering whether to issue injunctive relief altering election rules are "required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). This is because "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5. Accordingly, the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citations omitted); *accord Libertarian Party of Ill. v. Cadigan*, No. 20-1961, 2020 WL 5104251, at *4 (7th Cir. Aug. 20, 2020) ("[F]ederal courts should

refrain from changing state election rules as an election approaches."); *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014), *mot. to vacate stay den'd*, 135 S.Ct. 9 (2014) (holding that courts "should carefully guard against judicially altering the status quo on the eve of an election").

However, the primary concern addressed in *Purcell*, namely, that altering election rules or issuing conflicting court orders, particularly close to an election, can create voter confusion and lead to decreased turnout at the polls (or, in this case, a disincentive to vote by absentee ballot), is not implicated by the injunction requested here by Plaintiffs.  An order extending the noon Election Day receipt deadline for mail-in absentee ballots is straightforward and does not affect the procedure a voter must follow to properly submit an absentee mail-in ballot.  Rather, the change in the receipt deadline affects only what occurs *after* a voter has submitted their absentee ballot by mail.  Accordingly, there is no impact on the voting process itself, nor any real risk of voter confusion or dissuasion from casting a ballot.  *See Self-Advocacy Sols. N.D. v. Jaeger*, No. 3:20-cv-00071, 2020 WL 2951012, at *11 (D.N.D. June 3, 2020) ("[T]here is no potential for voter confusion or dissuasion from voting because the process for submitting an absentee ballot will remain unchanged.").  To the contrary, as other district courts addressing this issue have observed, *Purcell*'s concern about "safeguarding public confidence in election integrity" is in fact advanced by procedures that ensure valid mail-in ballots are not rejected for reasons beyond voters' control.  *See, e.g.*, *Richardson v. Tex. Sec'y of State*, No. 5A-19-cv-00963-OLG, 2020 WL 5367216, at *29 (W.D. Tex. Sept. 8, 2020), *appeal docketed*,

No. 20-50774 (5th Cir. Sept. 10, 2020) (citing *Self-Advocacy Sol.*, 2020 WL 2951012, at *10).

Accordingly, we hold that the balance of harms weighs in Plaintiffs' favor and the public interest supports the issuance of the injunction they seek.

## III.   Conclusion

For the reasons detailed above, Plaintiffs' Motion for Preliminary Injunction [Dkt. 9] is <u>GRANTED</u> and Defendants are preliminarily enjoined from enforcing the noon Election Day receipt deadline for mail-in absentee ballots, codified at Indiana Code §§ 3-11.5-4-3 and 3-11.5-4-10, in the November 3, 2020 election.  The specific language of the injunction will be set forth in a separate order as required by the Seventh Circuit.

IT IS SO ORDERED.

Date: _____9/29/2020_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Courtney Lyn Abshire
INDIANA ATTORNEY GENERAL
courtney.abshire@atg.in.gov

Aneel L. Chablani
CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS
achablani@clccrul.org

Ami Gandhi
CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS
agandhi@clccrul.org

Jefferson S. Garn
INDIANA ATTORNEY GENERAL
Jefferson.Garn@atg.in.gov

William R. Groth
MACEY SWANSON LLP
wgroth@fdgtlaborlaw.com

Ezra D. Rosenberg
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
erosenberg@lawyerscommittee.org

Mark W. Sniderman
FINDLING PARK CONYERS WOODY & SNIDERMAN, PC
msniderman@findlingpark.com

Ryan Snow
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
rsnow@lawyerscommittee.org

Jennifer Terrell
CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS
jterrell@clccrul.org